NO. 4-05-1050      Filed 3/19/07

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| MORR-FITZ, INC., an Illinois Corporation d/b/a FITZGERALD PHARMACY, Licensed and Practicing in the State of Illinois as a Pharmacy; L. DOYLE, INC., an Illinois Corporation d/b/a EGGELSTON PHARMACY, Licensed and Practicing in the State of Illinois as a Pharmacy; KOSIROG PHARMACY, INC., an Illinois Corporation d/b/a KOSIROG REXALL PHARMACY, Licensed and Practicing in the State of Illinois as a Pharmacy; LUKE VANDER BLEEK; and GLENN KOSIROG, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Appeal from Circuit Court of Sangamon County No. 05CH495 |
|       Plaintiffs-Appellants, | ) | |
|       v. | ) | |
| ROD R. BLAGOJEVICH, Governor, State of Illinois; FERNANDO E. GRILLO, Secretary, Illinois Department of Financial and Professional Regulations; DANIEL E. BLUTHARDT, Acting Director, Division of Professional Regulations; and THE MEMBERS OF THE STATE BOARD OF PHARMACY, in Their Official Capacities, | ) ) ) ) ) ) ) ) ) ) | Honorable John W. Belz, |
|       Defendants-Appellees. | ) | Judge Presiding. |

_____

JUSTICE KNECHT delivered the opinion of the court:

In October 2005, plaintiffs, two individual pharmacists and three Illinois corporations that own and operate pharmacies in Illinois, filed their first amended complaint seeking injunctive and declaratory relief against defendants, Governor Rod Blagojevich, Secretary Fernando Grillo of the Illinois Department of Financial and Professional Regulations, Acting

Director Daniel Bluthardt of the Division of Professional Regulations, and the State Board of Pharmacy. The suit alleged an administrative rule requiring pharmacies to dispense a certain contraceptive, levonorgestrol, also known as "Plan B" or the "morning after pill" (Rule) (68 Ill. Adm. Code §1330.91(j), as amended by 29 Ill. Reg. 13639, 13663 (eff. August 25, 2005)), violates federal and state law by forcing plaintiffs to dispense the "morning after pill" even though this violates their religious beliefs and consciences. In November 2005, the trial court granted the State's motion to dismiss with prejudice on the grounds of lack of standing, ripeness, and failure to exhaust administrative remedies. Plaintiffs appeal, arguing the following: (1) they had standing; (2) they did not have to wait until a customer presented them with a prescription and then refuse to fill the prescription, thereby subjecting themselves to disciplinary proceedings, before they could challenge the Rule; and (3) they did not need to exhaust their administrative remedies before bringing this action in circuit court. We affirm.

## I. BACKGROUND

Plaintiffs in this case allege having moral and religious objections to dispensing the "morning after pill." Based on the plaintiffs' beliefs, life begins at conception. As a result, according to plaintiffs' beliefs, the "morning after

pill" has the effect of destroying human life because it can prevent an already fertilized egg from implanting in the uterus.

According to the Rule, plaintiffs have certain obligations regarding emergency contraception, such as the "morning after pill."  The Rule states as follows:

"Duty of Division I Pharmacy to Dispense Contraceptives

1) Upon receipt of a valid, lawful prescription for a contraceptive, a pharmacy must dispense the contraceptive, or a suitable alternative permitted by the prescriber, to the patient or the patient's agent without delay, consistent with the normal timeframe for filling any other prescription.  If the contraceptive, or a suitable alternative, is not in stock, the pharmacy must obtain the contraceptive under the pharmacy's standard procedures for ordering contraceptive drugs not in stock, including the procedures of any entity that is affiliated with, owns, or franchises the pharmacy.  However, if the patient prefers, the prescription must be transferred to a local pharmacy of the patient's choice under

- 3 -

the pharmacy's standard procedures for transferring prescriptions for contraceptive drugs, including the procedures of any entity that is affiliated with, owns, or franchises the pharmacy. Under any circumstances an unfilled prescription for contraceptive drugs must be returned to the patient if the patient so directs.

2) For the purposes of this subsection (j), the term 'contraceptive' shall refer to all FDA-approved drugs or devices that prevent pregnancy." 68 Ill. Adm. Code §1330.91(j), as amended by 29 Ill. Reg. 13639, 13663 (eff. August 25, 2005).

The "morning after pill" falls within the definition of a contraceptive. The State has made clear it intends to enforce the Rule. Under the Pharmacy Practice Act of 1987 (Pharmacy Act) (225 ILCS 85/1 through 40 (West 2004)), the Department of Financial and Professional Regulation may take disciplinary action against a licensee if the licensee violates the Pharmacy Act or any rules promulgated under the Pharmacy Act. 225 ILCS 85/30(a)(2) (West 2004).

In October 2005, plaintiffs filed their first amended complaint for declaratory and injunctive relief challenging the

Rule, claiming various state and federal causes of action. In their amended complaint, plaintiffs allege they have been presented with prescriptions for emergency contraception in the past. However, they failed to allege that they have been presented with a prescription for emergency contraception since the Rule went into effect. Plaintiffs also failed to allege they stock the "morning after pill," the Rule requires them to do so, or the Rule has required them to take any immediate action to comply with the Rule. That same month, the State filed a motion to dismiss plaintiffs' claim based on their lack of standing. The trial court dismissed plaintiffs' claim with prejudice based on plaintiffs' lack of standing, lack of ripeness of the claim, and plaintiffs' failure to exhaust their administrative remedies.

This appeal followed. In August 2006, the Food and Drug Administration (FDA) approved "Plan B" for over-the-counter, nonprescription sales to women age 18 and older.

## II. ANALYSIS

### A. Standard of Review

We review de novo a trial court's decision to grant a motion to dismiss. Midland Hotel Corp. v. Director of Employment Security, 282 Ill. App. 3d 312, 315, 668 N.E.2d 82, 85 (1996).

### B. Standing in Declaratory-Judgment Actions

According to our supreme court, a preliminary question in any declaratory-judgment action is whether the plaintiff has

- 5 -

standing.  Messenger v. Edgar, 157 Ill. 2d 162, 170, 623 N.E.2d
310, 313 (1993).  According to our supreme court, "standing only
requires some injury in fact to a legally cognizable interest."

> "There are two components to the standing
> requirement in the context of declaratory[-]
> judgment actions.  There must be [(1)] an
> 'actual controversy' between adverse parties,
> and [(2)] the party seeking the declaratory
> judgment must be 'interested' in the
> controversy."  Flynn v. Ryan, 199 Ill. 2d
> 430, 436, 771 N.E.2d 414, 418 (2002).

In Underground Contractors Ass'n v. City of Chicago, 66
Ill. 2d 371, 362 N.E.2d 298 (1977), the supreme court explained
both of these components.  As for the second component that a
party must be "interested" in the controversy, the court has
stated:

> "The word[] 'interested' does not mean merely
> having a curiosity about or a concern for the
> outcome of the controversy.  Rather, the
> party seeking relief must possess a personal
> claim, status, or right which is capable of
> being affected. [Citations.]  The dispute
> must, therefore, touch the legal relations of
> parties who stand in a position adverse to

- 6 -

one another."  Underground Contractors Ass'n,

66 Ill. 2d at 376, 362 N.E.2d at 301.

As for the "actual controversy" component, the court has stated:

"'Actual' in this context does not mean that

a wrong must have been committed and injury

inflicted.  Rather, it requires a showing

that the underlying facts and issues of the

case are not moot or premature, so as to

require the court to pass judgment on mere

abstract propositions of law, render an

advisory opinion, or give legal advice as to

future events.  [Citations.]  The case must,

therefore, present a concrete dispute

admitting of an immediate and definitive

determination of the parties' rights, the

resolution of which will aid in the

termination of the controversy or some part

thereof."  Underground Contractors Ass'n, 66

Ill. 2d at 375, 362 N.E.2d at 300.

Most of the arguments of both plaintiffs and defendants center on these two components.  Both plaintiffs and defendants ignore the fact that this is not the only consideration courts take into account in determining whether they will hear a declaratory judgment action concerning the validity of an administrative

action.

In <u>Abbott Laboratories v. Gardner</u>, 387 U.S. 136, 138-39, 18 L. Ed. 2d 681, 686, 87 S. Ct. 1507, 1510 (1967) (<u>Abbott Labs</u>), the petitioners challenged an administrative regulation, arguing the Commissioner of Food and Drugs exceeded the authority Congress granted in an amendment to the Federal Food, Drug, and Cosmetic Act.  The Supreme Court found the plaintiffs' claim was "ripe."  According to the Supreme Court:

> "The injunctive and declaratory judgment remedies are discretionary, and courts traditionally have been reluctant to apply them to <u>administrative</u> <u>determinations</u> unless these arise in the context of a controversy 'ripe' for judicial resolution.  Without undertaking to survey the intricacies of the ripeness doctrine it is fair to say that its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also *** protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging

parties." (Emphasis added.) <u>Abbott Labs</u>,

387 U.S. at 148-49, 18 L. Ed. 2d at 691, 87

S. Ct. at 1515.

The Court stated "[t]he problem [of determining whether a

controversy is 'ripe'] is best seen in a twofold aspect,

requiring [the court] to evaluate both the fitness of the issues

for judicial decision and the hardship to the parties of

withholding court consideration." <u>Abbott Labs</u>, 387 U.S. at 149,

18 L. Ed. 2d at 691, 87 S. Ct. at 1515.

In 1990, this court stated:

"[A] declaratory[-]judgment action may be

maintained where statutes or <u>administrative</u>

<u>rules</u>, which have cleared all the hurdles

prerequisite to their becoming fully

effective, require one either to take a

certain action or to refrain from a certain

action, regardless of the actual probability

of prosecution for noncompliance." (Emphasis

added.) <u>Kerr-McGee Chemical Corp. v.</u>

<u>Department of Nuclear Safety</u>, 204 Ill. App.

3d 605, 610, 561 N.E.2d 1370, 1374 (1990).

The above statement would seem to allow plaintiffs to pursue this

declaratory-judgment action even though they would not suffer any

hardship if judicial consideration was withheld. However, this

- 9 -

court made the above statement before our supreme court adopted the two-step process described in Abbott Labs to determine whether a claim is ripe for judicial consideration, which requires us "'to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" National Marine, Inc. v. Illinois Environmental Protection Agency, 159 Ill. 2d 381, 389, 639 N.E.2d 571, 574 (1994), quoting Abbott Labs, 387 U.S. at 149, 18 L. Ed. 2d at 691, 87 S. Ct. at 1515.

In the case at bar, the trial court dismissed plaintiffs' case in part because the court found the claim was not ripe. It is not entirely clear from the record whether the court meant plaintiffs did not meet the "actual controversy" requirement discussed by our supreme court in Underground Contractors Ass'n, or whether the court believed plaintiffs had not felt the concrete effects of the Rule and would not suffer any hardship by withholding court consideration. It appears the trial court was basing its decision on the former. It also appears plaintiffs and defendants also believed the court meant plaintiffs did not meet the "actual controversy" requirement because this is what both plaintiffs and defendants focused on in their briefs. This provides some explanation why plaintiffs failed to make any real argument that their claim was ripe under the test established in Abbott Labs.

- 10 -

That being said, this court's duty is not to determine if the trial court's reasoning was correct. Instead, our duty is to determine if the trial court's decision to dismiss plaintiffs' cause of action was correct. City of Chicago v. Holland, 206 Ill. 2d 480, 491-92, 795 N.E.2d 240, 247-48 (2003). We find it was correct.

Plaintiffs cite numerous cases in support of their argument they should not have to wait to violate the Rule before challenging it. However, most of the cases they cite deal with challenges to statutes or ordinances, not administrative rules. See Illinois Gamefowl Breeders Ass'n v. Block, 75 Ill. 2d 443, 448, 389 N.E.2d 529, 530 (1979) (constitutional challenge to certain provisions of the Humane Care for Animals Act); Hays v. City of Urbana, 104 F.3d 102, 103 (7th Cir. 1997) (challenge to the validity of a city ordinance); Babbitt v. United Farm Workers National Union, 442 U.S. 289, 292, 60 L. Ed. 2d 895, 902, 99 S. Ct. 2301, 2305 (1979) (challenge to the constitutionality of Arizona's farm-labor statute); Doe v. Bolton, 410 U.S. 179, 181, 35 L. Ed. 2d 201, 206, 93 S. Ct. 739, 742 (1973) (challenge to criminal statute placing restrictions on abortions); Virginia v. American Booksellers Ass'n, 484 U.S. 383, 388, 98 L. Ed. 2d 782, 791, 108 S. Ct. 636, 640 (1988) (challenge to statute that placed restrictions on the display of adult publications); Steffel v. Thompson, 415 U.S. 452, 456, 39 L. Ed. 2d 505, 512-13, 94 S. Ct.

- 11 -

1209, 1213-14 (1974) (challenge to criminal-trespass statute); Epperson v. Arkansas, 393 U.S. 97, 98, 21 L. Ed. 2d 228, 231, 89 S. Ct. 266, 267 (1968) (challenge to "anti-evolution" statute); Stenberg v. Carhart, 530 U.S. 914, 921-22, 147 L. Ed. 2d 743, 754, 120 S. Ct. 2597, 2604-05 (2000) (challenge to statute involving partial-birth abortions); Burson v. Freeman, 504 U.S. 191, 193, 119 L. Ed. 2d 5, 11, 112 S. Ct. 1846, 1848 (1992) (challenge to statute restricting speech within 100 feet to entrance to polling place); Village of Chatham v. County of Sangamon, 351 Ill. App. 3d 889, 893, 814 N.E.2d 216, 221 (2004) (question of which of two statutes controlled who had zoning and building-code jurisdiction); Boles Trucking, Inc. v. O'Connor, 138 Ill. App. 3d 764, 770, 486 N.E.2d 362, 364 (1985) (challenge to the constitutionality of section 18-702 of the Illinois Motor Carrier of Property Law). These cases would be more persuasive if plaintiffs were seeking declaratory relief from a statute passed by the Illinois General Assembly or an ordinance passed by a municipal body containing the same language found in the Rule.

However, plaintiffs are seeking declaratory relief from an administrative rule. It is fairly clear the issue of whether the Rule is facially valid is fit for a judicial decision. However, based on the allegations in plaintiffs' complaint, the chances of plaintiffs suffering any hardship in the future as a result of this rule are so slim, albeit not impossible, they do

not outweigh the judiciary's traditional reluctance to get involved in administrative determinations such as this.

This is not always the case. Situations do arise when the hardship to a plaintiff of withholding judicial consideration outweighs the judiciary's traditional reluctance to get involved in administrative determinations this early. For example, in Abbott Labs, the Supreme Court stated:

> "This is also a case in which the impact of the regulations upon the petitioners is sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage. These regulations purport to give an authoritative interpretation of a statutory provision that has a direct effect on the day-to-day business of all prescription drug companies; its promulgation puts petitioners in a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate. As the District Court found on the basis of uncontested allegations, 'Either they must comply with the every[-]time requirement and incur the costs of changing over their promotional material and labeling or they

must follow their present course and risk prosecution.' [Citation.] The regulations are clear-cut, and were made effective immediately upon publication; as noted earlier the agency's counsel represented to the District Court that immediate compliance with their terms was expected. If petitioners wish to comply they must change all their labels, advertisements, and promotional materials; they must destroy stocks of printed matter; and they must invest heavily in new printing type and new supplies. The alternative to compliance--continued use of material which they believe in good faith meets the statutory requirements, but which clearly does not meet the regulation of the Commissioner--may be even more costly. That course would risk serious criminal and civil penalties for the unlawful distribution of 'misbranded' drugs.

It is relevant at this juncture to recognize that petitioners deal in a sensitive industry, in which public confidence in their drug products is

especially important.  To require them to challenge these regulations only as a defense to an action brought by the Government might harm them severely and unnecessarily.  <u>Where the legal issue presented is fit for judicial resolution, and where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts under the Administrative Procedure Act and the Declaratory Judgment Act must be permitted, absent a statutory bar or some other unusual circumstance, neither of which appears here</u>.

The Government does not dispute the very real dilemma in which petitioners are placed by the regulation, but contends that 'mere financial expense' is not a justification for pre-enforcement judicial review.  It is of course true that cases in this Court dealing with the standing of particular parties to bring an action have held that a possible financial loss is not by itself a sufficient interest to sustain a judicial challenge to

governmental action. [Citations.] But there is no question in the present case that petitioners have sufficient standing as plaintiffs: the regulation is directed at them in particular; it requires them to make significant changes in their everyday business practices; if they fail to observe the Commissioner's rule they are quite clearly exposed to the imposition of strong sanctions." (Emphasis added.) Abbott Labs, 387 U.S. at 152-54, 18 L. Ed. 2d at 693-94, 87 S. Ct. at 1517-18.

In Alternate Fuels, Inc. v. Director of the Illinois Environmental Protection Agency, 215 Ill. 2d 219, 830 N.E.2d 444 (2004), our supreme court found the claim brought by Alternate Fuels against the Illinois Environmental Protection Agency (Agency) was ripe. The issue before the court was whether a business that has been issued a violation notice by an administrative agency for failure to secure a permit can proceed with a claim against the agency in circuit court to test the validity of the violation notice if the notice caused it to cease operations before the administrative agency made a final ruling. Alternate Fuels, 215 Ill. 2d at 221, 830 N.E.2d at 446.

Alternate Fuels was in the business of providing fuel

- 16 -

to customers in the form of shredded plastic agricultural chemical containers. Alternate Fuels, 215 Ill. 2d at 222, 830 N.E.2d at 446. In July 1998, the Agency issued a notice to the plaintiff that it was violating section 21(d) of the Illinois Environmental Protection Act (Act) (415 ILCS 5/21(d) (West 1998)) by storing and treating "waste" without a permit from the Agency. Alternate Fuels, 215 Ill. 2d at 227, 830 N.E.2d at 449. The Agency also alleged Alternate Fuels was violating section 21(e) of the Act (415 ILCS 5/21(e) (West 1998)). Alternate Fuels, 215 Ill. 2d at 227, 830 N.E.2d at 449. Alternate Fuels alleged after the Agency issued the violation notice, its primary investors withdrew their support and its primary supplier withdrew from its agreement with Alternate Fuels. Alternate Fuels then stopped its operations. Alternate Fuels, 215 Ill. 2d at 227, 830 N.E.2d at 449.

In its complaint against the Agency, Alternate Fuels asked for a declaration the materials it was using were not "waste" because they had not been discarded. Alternate Fuels, 215 Ill. 2d at 228, 830 N.E.2d at 449. The Agency moved to dismiss the claim, arguing the case did not present an actual ripe controversy because Alternate Fuels had not exhausted its administrative remedies. Alternate Fuels, 215 Ill. 2d at 228, 830 N.E.2d at 449. The circuit court denied the Agency's motion to dismiss and later granted Alternate Fuels' motion for summary

judgment, "finding that the materials were not 'wastes' because they were not discarded." Alternate Fuels, 215 Ill. 2d at 229, 830 N.E.2d at 449-50. The appellate court affirmed. Alternate Fuels, 215 Ill. 2d at 229, 830 N.E.2d at 450.

Before the supreme court, the Agency argued the claim was not ripe because the Agency had not concluded its investigatory process. Alternate Fuels, 215 Ill. 2d at 230, 830 N.E.2d at 450. After finding the issue fit for judicial decision, the court examined what, if any, hardship Alternate Fuels would suffer if the court withheld its consideration. According to the court, the Agency's interpretation of the Act created a dilemma for Alternate Fuels. Alternate Fuels, 215 Ill. 2d at 232, 830 N.E.2d at 452. It could secure what it considered an unnecessary permit with the required local siting approval, it could continue its operations without getting a permit and risk prosecution and serious penalties, or it could shut down its operations. Alternate Fuels, 215 Ill. 2d at 232-33, 830 N.E.2d at 452. After Alternate Fuels chose to shut down its operations, the Agency had no reason to refer the alleged violation for prosecution because the alleged violation was no longer occurring. The court found if it did not allow judicial review to Alternate Fuels it would basically eliminate any chance Alternate Fuels had of getting a determination of whether it was in fact processing "waste" under the Act. Alternate Fuels, 215

Ill. 2d at 233, 830 N.E.2d at 452. The court further found:

> "The Agency's decision affected [Alternate Fuels] in a concrete way; the notice of violation caused [Alternate Fuels] to lose financing, lose its suppliers, and halt operations, thereby ending [Alternate Fuels's] agreement with Illinois Power. Thus, [Alternate Fuels] has already felt a direct and palpable injury and has an immediate financial stake in the resolution of the instant action." Alternate Fuels, 215 Ill. 2d at 233, 830 N.E.2d at 452.

Plaintiffs' situation in the instant case is not nearly as compelling as the situations the plaintiffs faced in Abbott Labs and Alternate Fuels, respectively. The regulation at issue in this case has not forced plaintiffs out of business or had any effect on their day-to-day operations. In other words, plaintiffs have not felt the effects of this Rule in a concrete way. Further, plaintiffs are currently in compliance with the Rule, and it is extremely unlikely based on the allegations in plaintiffs' complaint that one of the individual plaintiffs in this case will ever be placed in a position where he will either have to violate his conscience or the letter of the Rule. As a result, plaintiffs will not suffer any hardship by our denial of

- 19 -

judicial consideration.

We do not foreclose with this ruling the possibility of another pharmacist alleging facts sufficient to allow him or her to bring a preenforcement challenge to the validity of this Rule. We are only holding plaintiffs in this case have not pleaded facts establishing that they have felt the effects of this rule in a concrete way and will suffer a substantial hardship if they are not allowed to pursue this action at this time. Further, the provisions of neither the Illinois Health Care Right of Conscience Act (745 ILCS 70/1 through 14 (West 2004)) nor the Illinois Religious Freedom Restoration Act (775 ILCS 35/1 through 99 (West 2004)) makes this claim ripe for our consideration.

C. Exhaustion of Administrative Remedies

Because we have found this claim is not ripe for review, we decline plaintiffs' invitation to address this issue.

III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

APPLETON, J., concurs.

TURNER, J., dissents.

JUSTICE TURNER, dissenting:

I disagree with the majority's conclusion that the provisions of the Health Care Right of Conscience Act (Right of Conscience Act) and the Illinois Religious Freedom Restoration Act fail to make plaintiffs' claims ripe for consideration. Therefore, I respectfully dissent.

### A. Right of Conscience Act

Section 2 of the Right of Conscience Act provides, in part, as follows:

"The General Assembly finds and declares that people and organizations hold different

- 21 -

beliefs about whether certain health[-]care services are morally acceptable.  It is the public policy of the State of Illinois to respect and protect the right of conscience of all persons who *** are engaged in *** health[-]care services *** and to prohibit all forms of discrimination, disqualification, coercion, disability[,] or imposition of liability upon such persons or entities by reason of their refusing to act contrary to their conscience or conscientious convictions in refusing to obtain, receive, accept, deliver, pay for, or arrange for the payment of health[-]care services and medical care."

745 ILCS 70/2 (West 2004).

"Conscience" has been defined as "a sincerely held set of moral convictions arising from belief in and relation to God, or which, though not so derived, arises from a place in the life of its possessor parallel to that filled by God among adherents to religious faiths."  745 ILCS 70/3(e) (West 2004).  Section 5 prohibits public officials from discriminating against persons "in any manner" because of that person's "conscientious refusal to *** participate in any way in any particular form of health[-]care services contrary to his or her conscience."  745

ILCS 70/5 (West 2004).  A person injured by any action prohibited by the Right of Conscience Act may commence an action therefor and recover damages.  745 ILCS 70/12 (West 2004).

I would find plaintiffs have stated a compelling case under the Right of Conscience Act, one that is worthy of and ripe for consideration.  In the case sub judice, plaintiff pharmacists are alleged to have moral and religious objections to dispensing emergency contraception pursuant to the Rule.  The Right of Conscience Act purports to protect their beliefs and prevent "all forms" of coercion on the part of the government to alter those beliefs.  Governor Blagojevich, however, has stated pharmacists "are not free to let [religious] beliefs stand in the way" of delivering emergency contraception to customers and "must fill prescriptions without making moral judgments."  Press Release, Office of the Governor, Statement of Gov. Rod Blagojevich in response to lawsuit filed by Pat Robertson's American Center for Law and Justice challenging Governor's emergency rule for pharmacies (April 13, 2005), available at http://www.illinois.gov/PressReleases/PrintPressRelease.cfm?SubjectID=3&RecNum=3849.  Further, the Governor has warned pharmacists that the State will "vigorously protect" the right of access to birth control and will take "any and all necessary steps to ensure a woman's access to her health care."  Letter from Rod Blagojevich, Governor, State of Illinois, to Paul

Caprio, Executive Director, Family-Pac (April 11, 2005).  The intent of the Governor's statements is clear and undeniable-- either comply with the Rule or else.  Plaintiffs allege, there- fore, they must choose either to violate the Rule or their consciences, a form of coercion expressly prohibited by the Right of Conscience Act.  The risk of the revocation of their profes- sional licenses unless they comply with the Rule is the ultimate in government coercion, threatening their very livelihood in the workforce within the State of Illinois.  Accordingly, plaintiffs' claim the Right of Conscience Act offers them an avenue of relief is ripe for consideration.

B. Religious Freedom Restoration Act

Under section 10 of the Religious Freedom Restoration Act, the General Assembly has found "[t]he free exercise of religion is an inherent, fundamental, and inalienable right secured by [a]rticle I, [s]ection 3[,] of the Constitution of the State of Illinois."  775 ILCS 35/10(a)(1) (West 2004).  One of the purposes of the Religious Freedom Restoration Act is "[t]o provide a claim or defense to persons whose exercise of religion is substantially burdened by government."  775 ILCS 35/10(b)(2) (West 2004).

"Government may not substantially burden a person's exercise of religion, even if the burden results from a rule of general appli-

cability, unless it demonstrates that appli-

cation of the burden to the person (i) is in

furtherance of a compelling governmental

interest and (ii) is the least[-]restrictive

means of furthering that compelling govern-

mental interest."  775 ILCS 35/15 (West

2004).

Section 20 allows a person to raise a claim in a judicial pro-

ceeding and seek appropriate relief if his or her "exercise of

religion has been burdened in violation" of the Religious Freedom

Restoration Act.  775 ILCS 35/20 (West 2004).

Based on the purposes and protections of the Religious

Freedom Restoration Act, I would find plaintiffs have standing to

pursue their claims.  Plaintiffs have alleged the Rule burdens

their right to the free exercise of religion in violation of

Illinois law.  A forced choice between violating one's religious

beliefs and complying with the law can amount to a substantial

burden within the meaning of the Religious Freedom Restoration

Act.  See Wisconsin v. Yoder, 406 U.S. 205, 218, 32 L. Ed. 2d 15,

26, 92 S. Ct. 1526, 1534 (1972) ("[t]he impact of the compulsory-

attendance law on respondents' practice of the Amish religion is

not only severe, but inescapable, for the Wisconsin law affirma-

tively compels them, under threat of criminal sanction, to

perform acts undeniably at odds with fundamental tenets of their

religious beliefs"); <u>Sherbert v. Verner</u>, 374 U.S. 398, 404, 10 L. Ed. 2d 965, 970, 83 S. Ct. 1790, 1794 (1963) (where the appellant's declared ineligibility for benefits "force[d] her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand").

In this case, plaintiffs claim the Rule, along with the Governor's edicts, has placed substantial pressure on them to modify or violate their religious beliefs or face the threat of government sanction. The alleged disregard here by the State's Chief Executive of the fundamental constitutional rights of these Illinois citizens to the free exercise of their religious beliefs is sufficient to grant them standing under the Religious Freedom Restoration Act. Therefore, I would find plaintiffs have set forth a justiciable claim that the State has placed a substantial burden on their protected constitutional right to the free exercise of religion. As plaintiffs have established a compelling claim, their action is ripe for consideration.