Docket No. 104692.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

---

MORR-FITZ, INC., *et al.*, Appellants, v. ROD R. BLAGOJEVICH, Governor, State of Illinois, *et al.*, Appellees.

*Opinion filed December 18, 2008.*

JUSTICE THOMAS delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justices Kilbride, Garman, and Karmeier concurred in the judgment and opinion.

Justice Freeman dissented, with opinion, joined by Justice Burke.

## OPINION

Plaintiffs–two licensed pharmacists and three corporations that own and operate pharmacies in Illinois–brought a declaratory judgment action in the circuit court of Sangamon County against various Illinois public officials and the State Board of Pharmacy, seeking to invalidate an administrative rule that forces pharmacies to dispense Plan B contraception (also known as the morning-after pill or emergency contraception). The rule provided that a pharmacy *must dispense* the contraceptive without delay upon receipt of a valid prescription. If the item is not in stock, the pharmacy must order it if the patient requests that it do so. 68 Ill. Adm. Code §1330.91(j)

(2005). The plaintiffs' nine-count amended complaint alleged, *inter alia*, violations of the Illinois Health Care Right of Conscience Act (Conscience Act or Act) (745 ILCS 70/1 *et seq.* (West 2004)) and the Illinois Religious Freedom Restoration Act (Religious Freedom Act) (775 ILCS 35/1 *et seq.* (West 2004)), as well a claim that the rule was unconstitutional on its face and as applied because it violated the first amendment of the United States Constitution. Plaintiffs alleged that the rule contravenes their moral and religious beliefs because they believe that life begins at conception and that Plan B can act as an abortifacient.

The circuit court dismissed the complaint with prejudice on grounds of standing, ripeness, and failure to exhaust administrative remedies. A divided appellate court affirmed. 371 Ill. App. 3d 1175. We granted plaintiffs' petition for leave to appeal. 210 Ill. 2d R. 315. For the reasons set forth below, we reverse the judgment of the appellate court.

BACKGROUND

According to the amended complaint, plaintiffs Luke Vander Bleek and Glen Kosirog are licensed pharmacists who own and control a number of Division I pharmacies. A Division I pharmacy is a pharmacy that engages in "general community pharmacy practice and that is open to, or offers pharmacy services to, the general public." 68 Ill. Adm. Code §1330.5 (2005). Vander Bleek resides in Morrison, Illinois, and is owner of the Fitzgerald pharmacy and the sole shareholder of Morr-Fitz, Inc., the corporation that controls the Fitzgerald pharmacy. The Fitzgerald pharmacy has two locations, one in Prophetstown, Illinois, and the other in Morrison. Additionally, Vander Bleek is the majority shareholder of L. Doyle, Inc., which does business as the Eggleston Pharmacy, with locations in Sycamore, Illinois, and Genoa, Illinois. Vander Bleek is the chief pharmacist at his Morrison location.

The amended complaint further alleges that Vander Bleek is the third of 12 children and a lifelong Catholic. He graduated from the University of Illinois in 1986 with a bachelor of science degree in pharmacy, concentrated in medical chemistry and drug design. He has formed a professional opinion "about teratogenic or abortifacient

drugs and their destruction of what he considers is human life," and he believes that Plan B has an "abortifacient mechanism of action." Through prayerful reflection and consideration as a practicing Catholic, he has informed his beliefs and conscience on which he relies to hold that life begins at conception. He therefore does not believe that his convictions allow him to dispense Plan B. He also does not believe that the pharmacies he controls can cooperate in the sale or dispensing of drugs like Plan B and therefore conscientiously objects on behalf of his corporation. Over the past several years, he has affirmed his company policy of not dispensing drugs with abortifacient qualities when his pharmacies were presented with prescriptions for such drugs. Specifically, his company's written policy is that in the event that a prescription for emergency contraception is presented, the pharmacist on duty is to immediately return the prescription to the patient. He is then to communicate in a confidential environment, without lecturing about morality, that company policy does not allow the pharmacy to procure, stock or dispense the product.

According to the amended complaint, plaintiff Kosirog resides in Wheaton, Illinois, and is the sole shareholder of Kosirog Pharmacy, Inc., which does business as Kosirog Rexall Pharmacy in Cook County. Kosirog is a lifelong Christian and has five children, one with Down's Syndrome. He graduated from the University of Wyoming in 1982, earning a bachelor of science degree in pharmacy. He has formed a professional opinion "about teratogenic or abortifacient drugs and their destruction of what he considers is human life." He believes that Plan B has an "abortifacient mechanism of action, i.e., [it] can cause abortions by preventing an already fertilized egg from implanting in the womb."[1] Based on Kosirog's conscience and belief, his pharmacy forbids the sale or dispensing of drugs suspected to have teratogenic or abortifacient qualities, such as Plan B. In specific instances over the past few years when presented

---

[1]This is consistent with the United States Food and Drug Administrations official website statement about Plan B, which acknowledges that "[if] fertilization does occur, Plan B may prevent a fertilized egg from attaching to the womb." http://www.fda.gov/CDER/drug/infopage/planBQandA.htm.

with prescriptions for such drugs, Kosirog, on behalf of his pharmacy, has affirmed the aforementioned policy not to dispense such drugs.

On April 1, 2005, the Governor filed an "Emergency Rule" that amended section 1330.91 of title 68 of the Illinois Administrative Code. The emergency amendment became permanent in the form of an administrative rule (hereinafter "the rule" or "subsection (j)") on August 25, 2005, and states in relevant part as follows:

> "j) Duty of Division I Pharmacy to Dispense Contraceptives
>
> 1) Upon receipt of a valid, lawful prescription for a contraceptive, a pharmacy must dispense the contraceptive *** to the patient or the patient's agent without delay, consistent with the normal timeframe for filling any other prescription. If the contraceptive *** is not in stock, the pharmacy must obtain the contraceptive under the pharmacy's standard procedures for ordering contraceptive drugs not in stock, including the procedures of any entity that is affiliated with, owns, or franchises the pharmacy. However, if the patient prefers, the prescription must be transferred to a local pharmacy of the patient's choice under the pharmacy's standard procedures for transferring prescriptions for contraceptive drugs, including the procedures of any entity that is affiliated with, owns, or franchises the pharmacy. Under any circumstances an unfilled prescription for contraceptive drugs must be returned to the patient if the patient so directs.
>
> 2) For purposes of this subsection (j), the term 'contraceptive' shall refer to all FDA-approved drugs or devices that prevent pregnancy." 68 Ill. Adm. Code §§1330.91(j)(1), (j)(2) (2005).

Plan B and the morning-after pill fall within the above-quoted rule's definition of contraceptives. On October, 28, 2005, plaintiffs filed their first amended complaint seeking a declaration that the rule is invalid. Plaintiffs also sought an injunction against the rule's enforcement. Named defendants in the suit included Rod Blagojevich, the Governor of the State of Illinois, Fernando Grillo, then the

secretary of the Illinois Department of Financial and Professional Regulation (Department), Daniel Bluthhardt, then the acting director of the Department's Division of Professional Regulation (Division), and the State Board of Pharmacy.[2]

With respect to the language of the rule, plaintiffs' amended complaint states that by "demanding that Division I Pharmacies fill any prescription for 'contraceptives,' including the 'morning-after pill' and 'Plan B,' [the rule] requires the Plaintiffs to act against the collective conscience of their corporate control group and against the policies of their pharmacies." Plaintiffs allege that both the emergency rule and the permanent rule were enacted for the purpose of compelling religious and conscientious objectors to fill Plan B contraceptive prescriptions despite those objections. Plaintiffs allege that when the emergency rule was promulgated on April 1, 2005, the Governor publicly warned that Illinois pharmacists who violate the rule face significant penalties, ranging from fines to the loss of professional licenses. Then, on April 13, 2005, the Governor issued a press release indicating that he will "vigorously defend" the emergency rule requiring pharmacists to sell and fill prescriptions for contraceptives without delay. The Governor further warned on that same date as follows:

> "If a pharmacy wants to be in the business of dispensing contraceptives, then it must fill prescriptions without making moral judgments. Pharmacists–like everyone else–are free to hold personal religious beliefs, but pharmacies are not free to let those beliefs stand in the way of their obligation to their customers." Press Release of Governor Blagojevich, April 13, 2005.[3]

---

[2]The identity of one of the defendants has changed. Fernando Grillo, formerly the secretary of the Department, has been succeeded by Dean Martinez, the current secretary. Pursuant to section 2–1008(d) of the Code of Civil Procedure (735 ILCS 5/2–1008(d) (West 2006)), plaintiffs' action now proceeds against Martinez. In addition, Daniel Bluthardt, formerly the acting director of the Division, is currently the director of the Division.

[3]On March 13, 2006, Governor Blagojevich allegedly reaffirmed his public position that the rule was directed at pharmacists who object to

Plaintiffs' complaint also alleges that as early as September 15, 2005–less than a month after the rule became final–defendants initiated proceedings against pharmacies alleged to have violated the rule and emphasized that they were "vigorously" enforcing the rule. See Illinois Department of Financial and Professional Regulation Press Release, September 15, 2005. Furthermore, defendants have issued an additional rule requiring all Division I pharmacies to "prominently display" a notice advising customers of the rule and inviting them to file complaints against refusing pharmacists with the Department through its website. 68 Ill. Adm. Code §§1330.91(k)(1), (k)(2) (2005).

Plaintiffs filed a motion for a temporary restraining order on September 14, 2005. The trial court denied the motion after a hearing, finding that plaintiffs have "another adequate remedy at law and [are] not likely to be successful on the merits due to standing and ripeness issues." On October 28, 2005, plaintiffs filed their amended complaint, along with a motion for a temporary injunction to enjoin enforcement of the rule. On that same day, defendants filed a motion to dismiss pursuant to section 2–619 of the Code of Civil Procedure (735 ILCS 5/2–619 (West 2004)). In their motion, defendants argued, among other things, that plaintiffs lacked standing to challenge subsection (j) and failed to exhaust their administrative remedies because they did not wait to be sued and disciplined by the Department before resorting to a declaratory judgment action in circuit court. Following a hearing, the circuit court granted defendants' motion to dismiss. The docket entry for November 18, 2005, showed that the court "rule[d] in favor of Defendants granting the motion to dismiss with prejudice on the grounds of lack of standing, ripeness, and failure to exhaust administrative remedies."

In December 2005 plaintiffs timely filed their notice of appeal, arguing, *inter alia*, that they had standing to bring their claim and they were not required to exhaust administrative remedies. In August 2006, prior to the filing of the appellate court opinion in this case, the

---

dispensing certain drugs on moral grounds. See *Menges v. Blagojevich*, 451 F. Supp. 2d 992, 997 (C.D. Ill. 2006). According to the complaint in *Menges*, the Governor stated that pharmacists who "hold such moral views should find another profession." *Menges*, 451 F. Supp. 2d at 997.

United States Food and Drug Administration (FDA) approved Plan B contraceptives for over-the-counter, nonprescription sale to women 18 and older. The drug remains available as a prescription drug for women 17 and under. Subsection (j) applies only to prescriptions for contraceptives and not to over-the-counter sales.

In March 2007, a divided appellate court affirmed the circuit court's dismissal of plaintiffs' complaint. 371 Ill. App. 3d 1175. The majority applied the ripeness standards set forth in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 18 L. Ed. 2d 681, 691, 87 S. Ct. 1507, 1515 (1967), which requires consideration of two factors: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." In applying *Abbott Laboratories*, the appellate court recognized that plaintiffs had satisfied the first factor in that (1) the Department's rule applies to plaintiffs, (2) the State had made clear it intended to enforce the rule, and (3) the issue of whether the rule is facially valid is fit for judicial decision. The majority concluded, however, that plaintiffs' claims were not ripe for review based on the second factor of *Abbott Laboratories*, finding that plaintiffs' chances of suffering future hardship were too "slim" to outweigh courts' "traditional reluctance to get involved in administrative determinations." 371 Ill. App. 3d at 1181. The majority predicted that it is "extremely unlikely" one of plaintiffs "will ever be placed in a position where he will have to violate either his conscience or the letter of the Rule." 371 Ill. App. 3d at 1184. In view of this holding, the appellate court declined to address whether plaintiffs failed to exhaust their administrative remedies. Justice Turner dissented, asserting that plaintiffs' claims were not only ripe, but compelling under both the Conscience Act and the Religious Freedom Act. 371 Ill. App. 3d at 1185, 1187 (Turner, J., dissenting).

Plaintiffs filed a petition for rehearing in the appellate court. In that petition, plaintiffs noted that the appellate court found that plaintiffs had "failed to allege that they have been presented with a prescription for emergency contraception since the Rule went into effect" (371 Ill. App. 3d at 1177), and that the court used this as a basis for finding that the rule's application to plaintiffs was remote. Plaintiffs attached two affidavits to their petition. In the first, Vander Bleek stated that since the rule went into effect, plaintiffs have been

presented with prescriptions for Plan B contraception more than 15 times. Plaintiffs argued in their petition that these were precisely the occurrences that the court found so "extremely unlikely" that their lack rendered plaintiffs' claims unripe.

Vander Bleek also alleged in his affidavit that his Prophetstown pharmacy had been forced to close because of the chilling effect of the rule. Vander Bleek explained that the pharmacist who ran the pharmacy at that location moved out of state. A replacement pharmacist ultimately refused to work there because of the possibility that the pharmacy could be prosecuted and lose its license because of its policy against selling morning-after contraceptives. No other qualified pharmacist could be found. As a result, the pharmacy was forced to close, resulting in an annual loss of profits of $75,000.

Additionally, plaintiffs attached an affidavit from Kosirog to their petition for rehearing. Kosirog's affidavit stated that he had been required to spend additional resources recruiting pharmacists and addressing their concerns about the impact of the rule upon his business.

The appellate court majority denied the petition for rehearing over a second dissent from Justice Turner. We allowed plaintiffs' petition for leave to appeal. 210 Ill. 2d R. 315. We further allowed the American Association of Pro Life Obstetricians and Gynecologists, the Christian Medical and Dental Associations, the Catholic Medical Association, Physicians for Life, and the National Association of Prolife Nurses to file an *amicus curiae* brief. We also allowed the Christian Legal Society and Christian Pharmacists Fellowship International to file an *amicus curiae* brief. In addition, we allowed the Illinois Pharmacists Association and the American Pharmacists Association to file an *amicus curiae* brief. Finally, we allowed the American Civil Liberties Union of Illinois to file an *amicus curiae* brief. 210 Ill. 2d R. 345.

After briefing and oral argument in this court, the Department revised subsection (j), effective April 16, 2008. The amendment was the result of a settlement in other litigation involving different parties over the legality of the rule. See 32 Ill. Reg. 7116 (May 2, 2008). The amended version of subsection (j) retains the essential features of the previous version, including the requirements that (1) a pharmacy which sells contraceptives must, when presented with a valid

prescription, dispense the contraceptive "without delay"; and (2) if the contraceptive is not in stock, the pharmacy "must obtain" the contraceptive under the pharmacy's standard procedures for ordering contraceptive drugs not in stock. The amended version, however, adds several, more onerous provisions pertaining specifically to "emergency contraception."

The amended version now specifically mandates that each retail pharmacy "use its best efforts to maintain adequate stock of emergency contraception to the extent that it continues to sell contraception." 68 Ill. Adm. Code §1330.91(j)(2) (amended by 32 Ill. Reg. 7116, eff. April 16, 2008). It also mandates a new dispensing procedure called "remote medication order processing" (RMOP). If a pharmacist objects to dispensing emergency contraception and there is no nonobjecting pharmacist present at this pharmacy, which is deemed by the amendment the "dispensing pharmacy," the dispensing pharmacy must still sell the emergency contraceptive through RMOP. RMOP involves a nonobjecting pharmacist at a different location authorizing the dispensing of the drug by a nonpharmacist employee at the dispensing pharmacy. 68 Ill. Adm. Code §§1330.91(j)(3)(A), (j)(3)(B) (amended by 32 Ill. Reg. 7116, eff. April 16, 2008). The new amendment further requires that a retail pharmacy must be responsible "for ensuring either that there is a non-objecting pharmacist scheduled at all times the pharmacy is open, or that there is a licensed pharmacist available to perform RMOP for emergency contraception at all times the pharmacy is open and no non-objecting pharmacist is available at the pharmacy." 68 Ill. Adm. Code §1330.91(j)(4) (amended by 32 Ill. Reg. 7116, eff. April 16, 2008).

ANALYSIS

Before this court, plaintiffs first argue that their claims for declaratory and injunctive relief are ripe for judicial review and should not have been dismissed. Plaintiffs contend that their preenforcement challenge to the validity of the regulation is justiciable because the very existence of the rule constitutes illegal coercion in violation of the Illinois Health Care Right of Conscience Act and the Illinois Religious Freedom Restoration Act, as well as the first amendment of the United States Constitution. Plaintiffs also claim that they have stated a claim that is ripe for resolution

because–even absent an enforcement action by the state against plaintiffs–plaintiffs are given a right by these two Illinois statutes to pursue an affirmative claim. Additionally, plaintiffs maintain that they have satisfied the *Abbott Laboratories* test for ripeness because the rule has a concrete, negative impact on their operations, and they have therefore shown that sufficient hardship would be caused by withholding court consideration.

Defendants argue that plaintiffs' claims are unripe because the rule's application to plaintiffs is remote. Defendants claim that the rule's structure makes it unlikely–as a practical matter–that plaintiffs' obligations to dispense would ever be triggered. Relying on the version of the rule in effect prior to the April 16, 2008, amendment, defendants claim that the rule does not require plaintiffs to stock emergency contraception. Rather, it requires that if a potential customer presents a prescription, the pharmacy has to order the out-of-stock contraceptive only if the customer requests that the pharmacy order it. According to defendants, this is an unlikely event that tends to show that plaintiffs will not experience the rule's impact in a concrete way. Additionally, defendants argue that plaintiffs' complaint was properly dismissed because they failed to make use of a statutory variance procedure. Defendants note that the Illinois Pharmacy Practice Act of 1987 authorizes the Director to grant a variance excusing compliance with an administrative rule promulgated under the authority of the Pharmacy Act when applying the provision would be "unnecessarily burdensome." 225 ILCS 85/11(a) (West 2004). In defendants' view, plaintiffs' failure to seek a variance constituted a failure to exhaust administrative remedies.

I. Justiciability

We first examine whether the requirements of justiciability have been satisfied. Concepts of justiciability are divided into different categories, such as advisory opinions, feigned and collusive cases, standing, ripeness, mootness, political questions, and administrative questions. *Alternate Fuels, Inc. v. Director of the Illinois Environmental Protection Agency*, 215 Ill. 2d 219, 230 (2004). Where, as here, justiciability is challenged in a motion to dismiss under section 2–619, a court must accept as true all well-pleaded facts in plaintiffs' complaint and all inferences that can reasonably be

drawn in plaintiffs' favor. *In re Estate of Schlenker*, 209 Ill. 2d 456, 461 (2004). Moreover, it is well established that a cause of action should not be dismissed with prejudice unless it is clear that no set of facts can be proved under the pleadings which would entitle plaintiffs to relief. *Smith v. Central Illinois Regional Airport*, 207 Ill. 2d 578, 584-85 (2003). An order granting a motion to dismiss based on a lack of justiciability presents a question of law, which we review *de novo*. See *Doe v. Chicago Board of Education*, 213 Ill. 2d 19, 24 (2004); *Schlenker*, 209 Ill. 2d at 461.

Section 2–701 of the Code of Civil Procedure sets forth the general requirements for a justiciable declaratory judgment action, as follows:

"No action or proceeding is open to objection on the ground that a merely declaratory judgment or order is sought thereby. The court may, in cases of actual controversy, make binding declarations of rights, having the force of final judgments, whether or not consequential relief is or could be claimed, including the determination, at the instance of anyone interested in the controversy, of the construction of any statute *** or other governmental regulation *** and a declaration of the rights of the parties interested. The foregoing enumeration does not exclude other cases of actual controversy. The court shall refuse to enter a declaratory judgment or order, if it appears that the judgment or order, would not terminate the controversy or some part thereof, giving rise to the proceeding." 735 ILCS 5/2–701(a) (West 2006).

The declaratory judgment statute must be given a liberal construction and should not be unduly restricted by a technical interpretation. *First of America Bank, Rockford, N.A. v. Netsch*, 166 Ill. 2d 165, 174 (1995). This court has recognized that the " ' "mere existence of a claim, assertion or challenge to plaintiff's legal interests, *** which cast[s] doubt, insecurity, and uncertainty upon plaintiff's rights or status, damages plaintiff's pecuniary or material interests and establishes a condition of justiciability." ' " *Alternate Fuels*, 215 Ill. 2d at 231, quoting *Netsch*, 166 Ill. 2d at 175, quoting *Roberts v. Roberts*, 90 Ill. App. 2d 184, 187 (1967).

A threshold question in any declaratory judgment action is whether the plaintiff has standing. *Messenger v. Edgar*, 157 Ill. 2d 162, 170 (1993). To establish standing in such a case, there must be an "actual controversy" between adverse parties, and the party seeking the declaratory judgment must be "interested" in the controversy. *Underground Contractors Ass'n v. City of Chicago*, 66 Ill. 2d 371, 375-76 (1977). But here, we are considering justiciability in the context of administrative action, so we must specifically consider ripeness as a component of justiciability. *Alternate Fuels*, 215 Ill. 2d at 231. In this setting, the question of standing becomes subsumed in the question of ripeness. This is because the more stringent requirements for ripeness will necessarily establish the less strict demands of standing. Thus, if we reverse the appellate court's determination on ripeness in this case, we would necessarily reverse the trial court's determination on standing.

## A. *Ripeness*

The basic rationale of the ripeness doctrine is to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories*, 387 U.S. at 148-49, 18 L. Ed. 2d at 691, 87 S. Ct. at 1515. In *Abbott Laboratories*, the Supreme Court formulated a two-prong inquiry to evaluate ripeness: first, courts look at whether the issues are fit for judicial decision; and second, they look at any hardship to the parties that would result from withholding judicial consideration. *Abbott Laboratories*, 387 U.S. at 149, 18 L. Ed. 2d at 691, 87 S. Ct. at 1515. The Court held that the plaintiffs in that case, who were various drug companies, could bring a preenforcement challenge to an agency's interpretation of a federal statute that would have required the established name of a drug to be used every time the proprietary name is used. The Court found that the impact of the regulation was sufficiently direct and immediate so as to render judicial review appropriate because the plaintiffs would have to incur the significant cost of changing all their labels over or else risk criminal and civil penalties for their belief that their current labels were in compliance.

*Abbott Laboratories*, 387 U.S. at 152-53, 18 L. Ed. 2d at 693-94, 87 S. Ct. at 1517.

This court specifically adopted the *Abbott Laboratories* approach to considering ripeness claims in both *Alternate Fuels*, 215 Ill. 2d at 231, and *National Marine, Inc. v. Illinois Environmental Protection Agency*, 159 Ill. 2d 381, 389 (1994). In *Alternate Fuels*, this court found that an agency's interpretation of a statute was ripe for judicial review where the agency interpretation affected the plaintiff in a "concrete way," causing the plaintiff to lose financially. *Alternate Fuels*, 215 Ill. 2d at 233. *National Marine*, on the other hand, found that the mere issuance of a notice under section 4(q) of the Illinois Environmental Protection Act did not make the plaintiff's claims ripe where there was no effect on the plaintiff's legal rights, as it remained free to deal with its property as it saw fit. *National Marine*, 159 Ill. 2d at 389-90.

Here, we conclude that plaintiffs' claims are ripe under the *Abbott Laboratories* criteria. With respect to the first factor, the appellate court ruled in favor of plaintiffs, finding that "[i]t is fairly clear the issue of whether the Rule is facially valid is fit for a judicial decision." 371 Ill. App. 3d at 1181. We agree with the appellate court's assessment that the issues are fit for judicial decision. The claims raised are essentially legal in nature–whether the language of the rule violates the constitution and must therefore be declared void, as well as whether the rule violates various Illinois and federal statutes.[4] See *Minnesota Citizens Concerned for Life v. Federal*

---

[4] In addition to the specifically mentioned claims above, plaintiffs have alleged violations of (1) the Illinois Administrative Procedure Act (5 ILCS 100/5–5 *et seq.* (West 2004)), (2) the Illinois Pharmacy Practice Act of 1987 (225 ILCS 85/1 *et seq.* (West 2004)), (3) the Illinois Human Rights Act (775 ILCS 5/1–101 *et seq.* (West 2004)), (4) section 2000e of title VII of the federal Civil Rights Act of 1964 (42 U.S.C. §2000e (2000)), allegedly resulting in federal preemption of subsection (j) of the Department's rule, (5) the fourteenth amendment of the United States Constitution, and (6) the Weldon amendment, which prohibits certain federal assistance to states that discriminate against any individual or institutional health-care facility that refuses to take part in any facet of abortion. See Pub. L. No. 108–447, §508(d), 118 Stat. 2809 (December 8,

*Election Comm'n*, 113 F.3d 129, 132 (8th Cir. 1997) ("Fitness for judicial decision means, most often, that the issue is legal rather than factual").

As to the second factor, we find that sufficient hardship exists so as to make judicial review appropriate. Again, we note that defendants argue the version of the rule in effect prior to April 16, 2008. They contend that the rule does not require plaintiffs to stock Plan B contraception and therefore does not require plaintiffs to take, or refrain from, any action. Defendants further argue that the rule's structure makes it unlikely that plaintiffs' obligation to dispense would ever be triggered because it is a remote possibility that a customer would ever request plaintiffs to order Plan B. We disagree for several reasons.

First, we note that prior to the April 2008 amendment, all it would have taken to trigger the rule and subject plaintiffs to the possibility of license revocation was for a customer with a prescription for Plan B to say the words "order it." In any event, the rule has been changed and in its current form has an even greater concrete and coercive impact on plaintiffs. The rule now expressly requires that plaintiffs *must stock and dispense* Plan B contraception. Under the current version, the simple failure by plaintiffs to make efforts to stock the contraceptive in question would subject plaintiffs to a range of penalties, including license revocation. Additionally, they must dispense it within their stores through RMOP. Under these circumstances, application of the rule to plaintiffs cannot be considered remote. Instead, the rule affects their business operations on a day-to-day basis and exposes plaintiffs to strong sanctions. This case is thus indistinguishable from *Abbott Laboratories*, where the Court found that the plaintiffs could not be denied access to the courts under a ripeness theory, stating as follows: "the regulation is directed at them in particular; it requires them to make significant changes in their everyday business practices; if they fail to observe the Commissioner's rule they are quite clearly exposed to the imposition

2004); see also 42 U.S.C. §300a–7(b)(1) (2000); 42 U.S.C. §238n(a)(1), (c)(2) (2000).

of strong sanctions." *Abbott Laboratories*, 387 U.S. at 154, 18 L. Ed. 2d at 694, 87 S. Ct. at 1518.

Furthermore, we note that it is appropriate for this court to consider the latest version of the rule to inform our ripeness decision. Again, we point out that the trial court's order granting the motion to dismiss should not be affirmed unless it appears that plaintiffs can prove no set of facts that would entitle them to recovery. Moreover, ripeness is decided based on all the information available to the court at the time of the decision; intervening events that occur after the decision in the lower courts should be included, just as must be done with questions of mootness. See 13A C. Wright, A. Miller, E. Cooper & R. Freer, Federal Practice & Procedure §3532.1 (Supp. 2007). See, *e.g.*, *Blanchette v. Connecticut General Insurance Corps.*, 419 U.S. 102, 140, 42 L. Ed. 2d 320, 351, 95 S. Ct. 335, 356-57 (1974); *Hargrave v. Vermont*, 340 F.3d 27, 34 (2d Cir. 2003); *Buckley v. Valeo*, 424 U.S. 1, 114-18, 46 L. Ed. 2d 659, 742-44, 96 S. Ct. 612, 680-82 (1976) (*per curiam*) (basing ripeness determination on facts occurring "[s]ince the entry of judgment by the Court of Appeals"); *In re UAL Corp.*, 468 F.3d 444, 453 (7th Cir. 2006) (describing *Buckley* as a case where "dispute [was] resolved on the merits on appeal, even though the controversy was not ripe at the time the district court acted"); *Reno v. Catholic Social Services, Inc.*, 509 U.S. 43, 73, 125 L. Ed. 2d 38, 66, 113 S. Ct. 2485, 2504 (1993) ("it is the situation now *** rather than at the time of the initial complaints, that must govern") (O'Connor, J., concurring)); *cf. Fisch v. Loews Cineplex Theatres, Inc.*, 365 Ill. App. 3d 537, 538 (2005) (considering new evidence alleged after appellate briefing on issue of mootness); *City of Chicago v. Yellen*, 325 Ill. App. 3d 311, 314 (2001) (allowing supplementation of the record to aid the court in deciding personal jurisdiction).

Second, we believe that sufficient hardship exists based on plaintiffs' affidavits attached to their appellate court petition for rehearing. These affidavits show that plaintiffs have already suffered financial loss because of the rule. Vander Bleek asserted that he was forced to close one store because of the rule at an annual cost of $75,000. Kosirog also claimed financial loss due to having to expend additional resources to recruit pharmacists and to address concerns about the rule. These circumstances are similar to the choice the

plaintiffs faced in both *Abbott Laboratories* and *Alternate Fuels* between complying with the regulation at added cost or else continuing on in opposition to the rule and risking the even greater harm of serious penalties. See *Abbott Laboratories*, 387 U.S. at 154, 18 L. Ed. 2d at 694, 87 S. Ct. at 1518; *Alternate Fuels*, 215 Ill. 2d at 232-33. In sum, the rule has affected plaintiffs in a concrete way on a day-to-day basis, and they can allege that they have lost financially.

Finally, we note that the rule contained in subsection (j) in both the pre- and post-April 16, 2008, version, poses harm to the plaintiffs that is even greater than financial loss. Plaintiffs allege that the rule chills their first amendment rights. Plaintiffs are forced to comply with the rule or else compromise their rights to act according to their consciences and religious tenants. In such a case, courts relax the ripeness requirement of *Abbott Laboratories*. See, *e.g.*, *Minnesota Citizens Concerned For Life*, 113 F.3d at 132 ("Sufficient hardship is usually found if the regulation *** chills protected First Amendment activity"). In fact, courts routinely find not just harm, but *irreparable* harm, where a plaintiff asserts a chill on free exercise rights. See, *e.g.*, *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 178 (3d Cir. 2002); *Stormans, Inc. v. Selecky*, 524 F. Supp. 2d 1245, 1266 (W.D. Wash. 2007) (finding the first amendment claims of pharmacists and pharmacies were ripe and granting a preliminary injunction because of the likelihood of success on the merits and the possibility of irreparable injury).

Here, plaintiffs' complaint raises a first amendment claim. Specifically, they allege that the rule substantially burdens their free exercise of religion, is not narrowly tailored to serve a compelling governmental interest, and is not the least restrictive means of serving any alleged governmental interest. Plaintiffs also assert that the purpose and object of the rule is to coerce conscientious and religious objectors to fill Plan B prescriptions despite their objections.

Courts have specifically found that pharmacists and pharmacies in similar cases involving state regulation requiring the dispensing of Plan B contraception have sufficiently stated causes of action that could be considered by the judiciary. See *Stormans, Inc. v. Selecky*, 524 F. Supp. 2d 1245 (W.D. Wash. 2007) (found that plaintiffs' claims were ripe where plaintiffs had sufficiently alleged a first amendment claim); *Menges v. Blagojevich*, 451 F. Supp. 2d 992

(C.D. Ill. 2006) (court denied defendants' motion to dismiss and directed them to answer complaint that sufficiently alleged a first amendment violation). Accordingly, we find that plaintiffs have stated a cause of action that is ripe for judicial review.

## B. *Exhaustion and the Variance Procedure*

We next turn to defendants' contention that plaintiffs failed to exhaust their administrative remedies by failing to seek a variance before the Department. We initially note that the circuit court dismissed the amended complaint *with prejudice* on the grounds of lack of standing, ripeness and failure to exhaust administrative remedies. With respect to the exhaustion-of-remedies ground, the circuit court did not consider whether plaintiffs were required to seek a variance before proceeding; this issue was not raised by defendants until sometime in the appellate court. Instead, the exhaustion argument in the circuit court centered around whether plaintiffs should have to slog through a disciplinary proceeding and suffer loss of their licences, or at least wait to be cited and sued, before challenging the rule in circuit court. The appellate court affirmed the dismissal with prejudice on the sole grounds of ripeness. It did not reach the exhaustion-of-remedies issue, finding it was unnecessary to reach it given its holding on ripeness.

We must reject the defendants' exhaustion argument for several reasons. First, the Pharmacy Practice Act of 1987 (Pharmacy Act) (225 ILCS 85/11 *et seq.* (West 2004)) does not provide any procedure for the filing of a claim by a party who has conscientious objections to the rule and whose rights might be chilled by the rule. Nor does it provide any procedure that would govern the agency's decision with respect to a variance from the rule. Specifically, the variance statute reads as follows:

> "Duties of the Department. The Department shall exercise the powers and duties prescribed by the Civil Administrative Code of Illinois for the administration of Licensing Acts and shall exercise such powers and duties necessary for effectuating the purpose of this Act. However, the following powers and duties shall be exercised only upon action and

-17-

report in writing of a majority of the Board of Pharmacy to take such action:

(a) Formulate such rules, not inconsistent with law and subject to the Illinois Administrative Procedure Act, as may be necessary to carry out the purposes and enforce the provisions of this Act. *The Director may grant variances from any such rules as provided for in this Section*;

***

(c) ***

*The granting of variances from rules promulgated pursuant to this Section in individual cases where there is a finding that:*

*(1) the provision from which the variance is granted is not statutorily mandated;*

*(2) no party will be injured by the granting of the variance; and*

*(3) the rule from which the variance is granted would, in the particular case, be unreasonable or unnecessarily burdensome.*" (Emphases added.) 225 ILCS 85/11 (West 2006). See 68 Ill. Adm. Code §1330.110 (2005).

The case before us poses a significantly different situation than all of the cases cited by the parties that discuss the exhaustion doctrine. Those cases involve situations where either (1) the applicable statute gave the litigant a right to bring a claim before the agency with a corresponding procedure to govern the claim before the agency (right to a hearing, time frame for decisions, etc.) or (2) the agency sought an enforcement action against the litigant, but he failed to wait for the completion of the agency proceeding or failed to take advantage of his right to reconsider the decision before the agency prior to seeking judicial review. Neither situation is applicable here. To the extent the second situation could be applicable, it would be more along the lines of a ripeness challenge than an exhaustion argument, because there is, as of yet, no agency enforcement action against plaintiffs. But as discussed above, we have already found that plaintiffs' claims are ripe for judicial consideration. Moreover, the Conscience Act and the Religious Freedom Act on which plaintiffs' claims are based expressly authorize plaintiffs to seek judicial relief

from the courts when their rights are burdened by government action. See 745 ILCS 70/12 (West 2006); 775 ILCS 35/20 (West 2006). Thus, this case clearly differs from all of the cited cases that have considered exhaustion.

Second, even if an exhaustion analysis applies, we note that there are a number of exceptions that would be applicable. An aggrieved party may seek judicial review of an administrative decision without complying with the exhaustion of remedies doctrine where a statute, ordinance or rule is attacked as unconstitutional on its face. *Canel v. Topinka*, 212 Ill. 2d 311, 321 (2004).

Here, plaintiffs' first amendment claim is a facial challenge to the statute. The difference between an as-applied and a facial challenge is that if a plaintiff prevails in an as-applied claim, he may enjoin the objectionable enforcement of a statute only against himself, while a successful facial challenge voids enactment in its entirety and in all applications. *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 306 (2008). Under plaintiffs' theory, if they prevail, the offending provisions of subsection (j) would be declared void completely, not just as applied to plaintiffs. It is therefore a facial challenge.

A challenge to a statute does not become an as-applied challenge, as opposed to a facial challenge, simply because the text is neutral and the law appears at first glance to be one of general applicability. A finding with respect to the facial neutrality of the statute should not be confused with the ultimate determination that a statute is void on its face because it has a religious motivation and does not satisfy strict scrutiny standards. See *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534, 124 L. Ed. 2d 472, 490, 113 S. Ct. 2217, 2227 (1993); *Stormans*, 524 F. Supp. 2d at 1257-58, 1266. If a rule is facially neutral as to the text, a court must then look beyond the face of the rule to determine the true object of the statute. See *Lukumi*, 508 U.S. at 534, 124 L. Ed. 2d at 491, 113 S. Ct. at 2227. Where the object of the rule is to infringe upon or restrict practices because of their religious motivation, the law is not neutral, and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest. *Lukumi*, 508 U.S. at 533, 124 L. Ed. 2d at 490, 113 S. Ct. at 2227. Pertinent to this inquiry is the historical background of the decision under challenge, the specific series of events leading to enactment of the subject regulation, and the

legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body. *Stormans,* 524 F. Supp. 2d at 1258, citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 267-68, 50 L. Ed. 2d 450, 465-66, 97 S. Ct. 555, 564-65 (1977). Additionally, the impact of the law in its actual operation is strong evidence of its operation and purpose. *Stormans*, 524 F. Supp. 2d at 1258, citing *Lukumi*, 508 U.S. at 535, 124 L. Ed. 2d at 491, 113 S. Ct. at 2228.

Here, the rule at issue is facially neutral as to the text, but plaintiffs have alleged that the rule was motivated by a desire to compel religious objectors to dispense Plan B contraceptives in violation of their beliefs and religious practices. In such a case, the regulation is subject to strict scrutiny and can only survive if it is justified by a compelling governmental interest. Accordingly, plaintiffs did not have to seek a variance and exhaust administrative remedies before filing their claim in circuit court.

A party may also seek review where no issues of fact are presented or agency expertise is not involved. *Canel*, 212 Ill. 2d at 321; *Castaneda v. Illinois Human Rights Comm'n*, 132 Ill. 2d 304, 309 (1989). Moreover, exhaustion is not required if the administrative remedy is inadequate or futile or in instances where the litigant will be subjected to irreparable injury due to lengthy administrative procedures that fail to provide interim relief. *Canel*, 212 Ill. 2d at 321.

In *Canel*, plaintiffs filed suit in circuit court seeking return of unliquidated stock that had been turned over to the state but belonged to plaintiffs. Plaintiffs did not comply with the administrative procedure that required them to specifically request a hearing with the Treasurer or seek judicial review of the final administrative decision of the Treasurer.

This court in *Canel* excused the lack of exhaustion by stating the following:

> "We note that, in this case, plaintiff specifically alleged that although section 15 of the Act allows the state discretion in returning the dividends of unliquidated stock to owners, 'it is the policy and practice of [the Treasurer's office] not to return to the property owner any income *** on securities held in custody pursuant to the Act.' Plaintiff further alleged

that 'in no case' has 'such income *** ever been returned to the owner.' In their motion to dismiss, defendants did not dispute plaintiff's allegations on this point. Indeed, one of defendants' bases for dismissal was that plaintiff was 'not entitled' to the dividends under the Act. In light of the parties' positions, this is not a case where facts need to have been developed before the agency nor does the question presented constitute a matter for agency expertise. Rather, the issue revolves around the construction and meaning of section 15 of the Act. Moreover, the pleadings reveal that it would have been futile for plaintiff, or any other similarly situated claimant for that matter, to exhaust administrative remedies with respect to asserting a claim for dividends on stock held by defendants pursuant to the Act because the defendants' position in these types of cases is that the Act transforms into state property dividends earned on shares of stock presumed abandoned under the Act. Defendants argue that because of that fact they need not return dividends to the previous owner. Section 15, however, clearly contains an exception that provides that claimants may in fact be entitled to dividends on unliquidated stock. Given that defendants, as alleged by plaintiff, have *never* chosen to exercise their discretion in favor of a claimant–despite the permissive language of the statute–we hold that exhaustion, under these circumstances, was unnecessary and that our review of section 15 is not limited solely to its facial validity. With this procedural matter settled, we now turn [to] the merits." (Emphasis added.) *Canel*, 212 Ill. 2d at 321-22.

We believe that *Canel* supports plaintiffs' position in the present case that seeking recourse before the administrative agency would be futile and that this is an exception to the exhaustion requirement. Plaintiffs have alleged that defendants are on record via the Governor's public statements, warning that the entire point of the rule is to coerce pharmacists with religious objections into dispensing Plan B contraceptives. The Governor has allegedly publicly stated that "pharmacists with moral objections [to dispensing Plan B contraceptives] should find another profession," and that they "must fill prescriptions without making moral judgments." Defendants have

-21-

also declared that the rule will be "vigorously enforced." Thus, it can be concluded that granting variances in these kinds of cases would eviscerate the whole purpose for the rule. Under such circumstances, exhaustion is not required.

Defendants argue that the main entities they are trying to coerce are large pharmacies that do not hold religious objections. They argue that they are trying to prevent situations where an individual pharmacist with a religious objection is the only one on duty when a Plan B prescription is called upon to be filled. But, if what defendants say is true, they could more narrowly tailor the rule to provide an exemption for pharmacies that hold religious objections. Instead, they have publicly stated that they will vigorously prosecute pharmacists with religious objections to drive them out of the profession and that a *pharmacy* must fill Plan B prescriptions without making moral judgments if it wants to stay in business.

Defendants also suggest that plaintiffs could get a variance if they could show (1) that they were "religious institutions," *i.e.*, have true religious objections, and (2) that there were other pharmacies within a certain number of blocks that would be able to fill such prescriptions. Then, defendants argue, the statutory standard for a variance could be met, which requires a showing that no one will be hurt and that application of the rule in this particular case would be burdensome and unreasonable. We find defendants' argument to be unpersuasive. The public statements of defendants in this case are analogous to the allegation in *Canel* that the remedy requested–return of funds–had never been granted before to anyone. Also, there is no indication that defendants have ever granted a variance or would choose to grant one to a pharmacy who refused to dispense Plan B contraceptives. And again, the Religious Freedom and Conscience Acts expressly confer a right to file a judicial action when the rights protected therein are infringed upon.

*Beahringer v. Page*, 204 Ill. 2d 363 (2003), is the main case relied upon by defendants to argue the inapplicability of the futility exception. In *Beahringer*, the plaintiff inmate filed a declaratory judgment action alleging that the warden violated his first amendment rights in authorizing the taking of his art supplies. The inmate had commenced the required administrative process by filing a complaint to challenge the confiscation. Basically, the statute required a decision

within 45 days "whenever possible." The inmate waited 60 days without receiving a decision or a response and then filed suit without first getting the response. *Beahringer* found that it was not enough for the plaintiff to allege that grievance procedures with the warden "historically have failed." *Beahringer* also found that the time requirements were merely directory. *Beahringer* further stated as follows:

"A party will not be required to exhaust his or her administrative remedies when it would be patently useless to do so. [Citation.] 'However, the fact that there are clear indications that the agency may or will rule adversely is generally inadequate to terminate the administrative process or to avoid the exhaustion requirement.' [Citations.] Further, mere conclusions of fact or law unsupported by specific factual allegations are insufficient to state a cause of action. [Citations.]

Plaintiff's declaratory judgment action was properly dismissed for failure to sufficiently plead that he exhausted his administrative remedies. Our holding obviates discussion of plaintiff's first amendment claim." *Beahringer*, 204 Ill. 2d at 378.

The case before us is easily distinguished from *Beahringer*. Here, plaintiffs have brought a facial challenge to the rule under the first amendment. Additionally, there is no administrative process that prevented the instant plaintiffs from bringing their claims in circuit court. Nor is there any procedure laid out in connection with seeking a variance. Instead, the statute simply says that the Director may grant a variance, with a list of criteria, which, based on the Governor's prior statements, show that it would violate the purpose of the rule to grant the variance. As to futility, plaintiffs rely upon more than a mere allegation that grievances have "historically failed." Rather, they rely upon the Governor's statements that the purpose of the rule is to coerce pharmacists into violating their religious objections. They also rely on defendants' declared intent to "vigorously enforce" the rule without ever mentioning the possibility that variances might be granted.

Defendants claim that the appropriate procedure to be followed in this case is for an aggrieved party to apply for a variance by writing

a letter or making a telephone call to the Department. The Director then considers the criteria for granting a variance under section 11 of the Pharmacy Act. Defendants further claim that granting a variance is a fact question that needs agency expertise because the Director would have to look at whether anyone will be hurt and if the applicant for the variance would really be burdened.

We do not find defendants' arguments persuasive. There is no provision in the statute for a hearing before granting or denying a variance, and the statute does not authorize the Director to conduct any such hearing. This militates against the notion that a fact question or agency expertise is crucial. As previously stated, if there are no questions of fact or agency expertise is not involved, a litigant is not required to exhaust remedies. In our opinion, this is largely a case involving a question of law–whether pharmacists and pharmacies can be compelled to violate their consciences and religious beliefs in violation of two Illinois statutes and the first amendment. There is no agency expertise involved. Accordingly, we find that plaintiffs did not have to seek a variance before proceeding with their claims in circuit court.


## II. Relief

As a final matter, we note that plaintiffs urge this court to reach the merits of their Conscience Act claim and declare subsection (j) void and facially invalid. We have previously acknowledged that plaintiffs' claims are legal in nature, but we do not believe that it would be consistent with our role as a reviewing court to rule on the merits of the Conscience Act where defendants, as of yet, have not been required to answer the allegations of plaintiffs' complaint in the trial court.

Additionally, we note that plaintiffs filed a motion for a temporary restraining order, which the trial court denied on justiciability grounds after a hearing. Plaintiffs did not file an interlocutory appeal from that order under Supreme Court Rules 307(a) or (d) (188 Ill. 2d Rs. 307(a), (d)). Thus, we do not consider its propriety here. Plaintiffs also moved for a preliminary injunction, but the trial court did not hold a hearing on this motion or rule upon it because the court granted defendants' motion to dismiss with

prejudice based on justiciability issues. As our discussion above indicates, we believe that plaintiffs' claims are ripe and that plaintiffs were not required to exhaust administrative remedies. The appropriate remedy is to reverse the judgments of the appellate and circuit courts and to remand the cause for further proceedings, including a hearing on plaintiffs' motion for a preliminary injunction and to allow further amendments to the plaintiffs' complaint.

CONCLUSION

For the foregoing reasons, we reverse the judgments of the appellate and circuit courts and remand the cause to the circuit court for further proceedings consistent with this opinion.

*Judgments reversed;*
*cause remanded.*

JUSTICE FREEMAN, dissenting:

The majority reverses the appellate court, holding that plaintiffs' challenge to the administrative rule requiring pharmacies to dispense prescription contraceptives (68 Ill. Adm. Code §1330.91(j) (2005)) is ripe for judicial review. The majority also holds that, even though plaintiffs undisputedly failed to seek a variance excusing their compliance with the rule, this did not constitute a failure to exhaust administrative remedies. Alternatively, the majority concludes that even if an exhaustion analysis applies, plaintiffs are exempt from the requirement under various exceptions.

I disagree with the majority regarding the exhaustion issue, which is dispositive. Plaintiffs' failure to seek a variance from the Director[5] pursuant to section 11 of the Pharmacy Practice Act of 1987

---

[5]The Illinois Administrative Code defines "Director" as "the Director of the Division of Professional Regulation with the authority delegated by the

(225 ILCS 85/11 (West 2004))[6] constituted a failure to exhaust administrative remedies, and plaintiffs were not exempt from the exhaustion requirement. Plaintiffs' complaint was properly dismissed by the circuit court. I write separately to explain why the exceptions to the exhaustion doctrine asserted by the majority do not apply.

"Generally, a party may not seek judicial relief from an administrative action unless the party has exhausted all available administrative remedies." *Arvia v. Madigan*, 209 Ill. 2d 520, 531 (2004). An exception to this doctrine provides that a plaintiff who attacks a statute or rule as unconstitutional on its face need not exhaust administrative remedies. *Arvia*, 209 Ill. 2d at 532. In the case at bar, the majority concludes that plaintiffs' claim is a facial rather than an as-applied challenge, and holds that the exception for facial challenges therefore applies. Citing *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 306 (2008), the majority explains the difference between facial and as-applied challenges in terms of the differing results if the plaintiff prevails. "The difference between an as-applied and a facial challenge is that if a plaintiff prevails in an as-applied claim, he may enjoin the objectionable enforcement of a statute only against himself, while a successful facial challenge voids [the] enactment in its entirety and in all applications." Slip op. at 19. The majority continues: "Under plaintiffs' theory, if they prevail, the offending provisions of subsection (j) would be declared void completely, not just as applied to plaintiffs. [Plaintiffs' challenge] is therefore a facial challenge." Slip op. at 19.

The majority fails to mention *Napleton*'s additional, somewhat different description of the distinction between facial and as-applied

---

Secretary [of the Department of Financial and Professional Regulation]." 68 Ill. Adm. Code §1330.5 (amended at 30 Ill. Reg. 16930, eff. October 12, 2006).

[6]The Pharmacy Practice Act of 1987 was scheduled to be repealed on January 1, 2008. However, on October 29, 2007, it was amended and renamed the Pharmacy Practice Act, and the repeal date was changed to January 1, 2018. Pub. Act 95–689, eff. October 29, 2007 (amending 225 ILCS 85/1 *et seq.* (West 2006)).

challenges when the challenge is first presented, rather than when a plaintiff prevails. With regard to facial challenges, *Napleton* explains:

> "A facial challenge to the constitutionality of a legislative enactment is the most difficult challenge to mount successfully [citation] because an enactment is facially invalid only if no set of circumstances exists under which it would be valid. [Citation.] The fact that the enactment could be found unconstitutional under some set of circumstances does not establish its facial invalidity." *Napleton*, 229 Ill. 2d at 305-06.

Accord *People v. Greco*, 204 Ill. 2d 400, 407 (2003). By contrast, "in an 'as applied' challenge a plaintiff protests against how an enactment was applied in the particular context in which the plaintiff acted or proposed to act, and the facts surrounding the plaintiff's particular circumstances become relevant." *Napleton*, 229 Ill. 2d at 306.

In the case at bar, plaintiffs' challenge to subsection (j) does not present a "facial" attack. It is premised on religious objections to the rule's requirements. However, plaintiffs do not–and cannot–allege that every retail pharmacy has such religious objections. Nevertheless, every retail pharmacy must comply with subsection (j). Plaintiffs fail to allege there is *no* set of circumstances under which subsection (j) would be valid. See, *e.g.*, *Greco*, 204 Ill. 2d at 407. Even if plaintiffs' challenge were successful, the rule would not be void "in its entirety and in all applications" (*Napleton*, 229 Ill. 2d at 306). In this instance, plaintiffs' claim is an "as applied" challenge rather than a facial attack. Accordingly, the exception to the exhaustion doctrine for facial challenges does not apply here.

Under a second exception to the exhaustion doctrine, a party is not required to exhaust administrative remedies where it would be patently futile to do so. *Beahringer v. Page*, 204 Ill. 2d 363, 378 (2003); *Castaneda v. Illinois Human Rights Comm'n*, 132 Ill. 2d 304, 309 (1989). The plaintiff bears the heavy burden of establishing that the futility exception applies to his or her case. See, *e.g.*, *Cullen v. Town Council*, 850 A.2d 900, 906 (R.I. 2004); *Coleman v. Newburgh Enlarged City School District*, 319 F. Supp. 2d 446, 450 (S.D.N.Y. 2004); *Rann v. Chao*, 154 F. Supp. 2d 61, 65 (D.D.C. 2001).

In the case at bar, the majority concludes that this exception applies as well, holding that it would be futile for plaintiffs to seek a variance. The majority points to public statements by the Governor and other defendants allegedly indicating that the purpose of the rule is to coerce pharmacists with religious objections into dispensing emergency contraceptives. The majority states: "[I]t can be concluded that granting variances in these kinds of cases would eviscerate the whole purpose for the rule. Under such circumstances, exhaustion is not required." Slip op. at 21. In reaching this conclusion, the majority notes defendants' contention that the main target of the rule is not pharmacists with religious objections to emergency contraception, but rather large pharmacies that do not have such religious objections. The majority also notes defendants' argument that "they are trying to prevent situations where an individual pharmacist with a religious objection is the only one on duty when a Plan B prescription [is presented]." Slip op. at 21. However, the majority dismisses these contentions, asserting that defendants should have "more narrowly tailor[ed] the rule to provide an exemption for pharmacies that hold religious objections." Slip op. at 21-22.

In focusing on public statements to determine the rule's purpose, the majority is forced to rely on questionable sources such as press releases. The majority should have looked to more appropriate sources such as the rule itself, as amended in April 2008, and the manner in which it is enforced.

The amended version of the rule (see 32 Ill. Reg. 7116, eff. April 16, 2008, amending 68 Ill. Adm. Code §1330.91(j)), which the majority describes in the background section of its opinion, retains the essential features of the previous version of the rule but adds what the majority describes as "several, more onerous provisions pertaining specifically to 'emergency contraception.' " Slip op. at 9. Chief among the changes pertaining to emergency contraception is a new dispensing procedure called "remote medication order processing" (RMOP). Notwithstanding the majority's description of the emergency-contraception changes as "more onerous," RMOP, which takes up the lion's share of the amendment, actually supports defendants' claims that (1) the target of the rule is not pharmacists with religious objections to emergency contraception, and (2) defendants are attempting to prevent situations where an individual

-28-

pharmacist with a religious objection is the only one on duty when a Plan B prescription is presented. Under RMOP, if a pharmacist objects to dispensing emergency contraception and there is no nonobjecting pharmacist present at the dispensing pharmacy, a nonobjecting pharmacist at a different (remote) location may authorize the dispensing of the drug by a nonpharmacist employee at the dispensing pharmacy. 68 Ill. Adm. Code §§1330.91(j)(3)(A), (j)(3)(B) (2008). In addition, a retail pharmacy "is responsible for ensuring either that there is a non-objecting pharmacist scheduled at all times the pharmacy is open, or that there is a licensed pharmacist available to perform RMOP for emergency contraception at all times the pharmacy is open and no non-objecting pharmacist is available at the pharmacy." 68 Ill. Adm. Code §1330.91(j)(4) (2008).

With regard to the manner in which the rule is enforced, plaintiffs specifically allege only three enforcement actions charging violations of subsection (j). Similar to the amended version of the rule, these three complaints provide support for defendants' contention that the rule is aimed at large pharmacies that do not have religious objections to emergency contraceptives, rather than pharmacies that hold such objections. Two of the three complaints were filed against Walgreen pharmacies, and the third was filed against an Osco pharmacy. According to defendants, these enforcement actions "involved large 'chain' pharmacies that (unlike plaintiffs) do stock emergency contraceptives and do not have a corporate policy of religious refusals to dispense. In those administrative complaints, the pharmacies allegedly failed to ensure that their employees complied with store policy and instead allowed individual pharmacists to obstruct customers' access to contraceptives."

In the case at bar, as previously noted, the majority's conclusion that the futility exception applies here is based, in large part, on public statements by the Governor and other defendants allegedly indicating that the purpose of the rule is to coerce pharmacists with religious objections into dispensing emergency contraceptives. Assuming, *arguendo*, that it is proper to base a determination of the rule's purpose on such public statements, rather than the rule itself and its manner of enforcement, I note that an examination of these public statements raises serious questions as to whether the purpose

of the rule actually was, as the majority asserts, to coerce pharmacists with religious objections into dispensing emergency contraceptives.

The majority refers, for example, to public statements by defendants that "they will vigorously prosecute pharmacists with religious objections." Slip op. at 22. The apparent source for this reference is a September 15, 2005, press release from the Department of Financial and Professional Regulation (Department), titled "Three Complaints Filed Against Pharmacies for Failure to Dispense Contraceptives." While "prosecute" does not appear in the release, the term "vigorously enforcing" does appear in the subheadline, which states: "IDFPR [Department] Vigorously Enforcing Gov. Blagojevich's Birth Control Rules." However, the vigorous enforcement referred to in the subheadline applies to pharmacies, not pharmacists. While the release, in describing two of the three complaints, refers to pharmacists refusing to fill prescriptions, the release nevertheless makes clear that the Department's enforcement actions are against *pharmacies*. The headline, for example, expressly refers to "Complaints Filed Against Pharmacies." The first paragraph of the release supports the headline, noting that the complaints were filed against "Illinois pharmacies" and explaining that the rule at issue clarified "the responsibilities of licensed retail pharmacies to fill prescriptions for all FDA approved contraceptives if the drug store dispenses birth control medications."

In sum, the majority's unequivocal stating of the purpose is not correct. At a minimum, it is questionable whether the purpose of the rule is to coerce pharmacists with moral objections into dispensing emergency contraceptives, or whether, instead, the rule is aimed at large pharmacies that do not have moral objections to dispensing emergency contraception, as defendants contend. Under the latter purpose, it would not be futile for plaintiffs to seek a variance from the Director. Granting a variance in this situation would not "eviscerate the whole purpose for the rule."

Because, at the very least, questions remain as to the rule's purpose, which in turn affects whether the variance procedure is futile, plaintiffs have failed to meet their high burden of establishing that the futility exception applies to them.

In support of its conclusion that the futility exception does apply here, the majority relies on *Canel v. Topinka*, 212 Ill. 2d 311 (2004),

-30-

which held that the plaintiff was exempted from exhausting administrative remedies because to do so would have been futile. In *Canel*, 288 shares of stock belonging to the plaintiff had been turned over to the state as property presumed abandoned. The stock, which was unliquidated, ultimately was returned to the plaintiff, but the state retained the dividends which had accrued on the stock during the time it was held by the state. The plaintiff filed suit in circuit court seeking, *inter alia*, the return of the dividends on the unliquidated stock. The plaintiff did not comply with the administrative procedure that required him to specifically request a hearing with the Treasurer or seek judicial review of the final administrative decision of the Treasurer. The plaintiff thus failed to exhaust his administrative remedies.

In concluding that the plaintiff was exempt from the exhaustion requirement under the futility exception, *Canel* stated:

> "[T]he pleadings reveal that it would have been futile for plaintiff, or any other similarly situated claimant for that matter, to exhaust administrative remedies with respect to asserting a claim for dividends on stock held by defendants pursuant to the Act because the defendants' position in these types of cases is that the Act transforms into State property dividends earned on shares of stock presumed abandoned under the Act. Defendants argue that because of that fact they need not return dividends to the previous owner. Section 15 [of the Act], however, clearly contains an exception that provides that claimants may in fact be entitled to dividends on unliquidated stock. Given that defendants, as alleged by plaintiff, have *never* chosen to exercise their discretion in favor of a claimant–despite the permissive language of the statute–we hold that exhaustion, under these circumstances, was unnecessary ***." (Emphasis in original.) *Canel*, 212 Ill. 2d at 322.

*Canel* is inapposite to the case at bar. In *Canel*, the defendants' position was that "the Act transforms into state property dividends earned on shares of stock presumed abandoned." *Canel*, 212 Ill. 2d at 322. The defendants argued that, because the dividends were so transformed, they need not be returned to the previous owner. In the instant case, by contrast, defendants argue that plaintiffs *should* seek

a variance from the rule's requirements. Indeed, as the majority itself notes:

> "Defendants also suggest that plaintiffs could get a variance if they could show (1) that they were 'religious institutions,' *i.e.*, have true religious objections, and (2) that there were other pharmacies within a certain number of blocks that would be able to fill such prescriptions. Then, defendants argue, the statutory standard for a variance could be met, which requires a showing that no one will be hurt and that application of the rule in this particular case would be burdensome and unreasonable." Slip op. at 22.

In *Canel*, it would have been patently useless for the plaintiff to exhaust administrative remedies, given the defendants' expressly stated position. That is not the situation in the case at bar. The majority's reliance on *Canel* in the instant case is misplaced.

The majority rejects *Beahringer v. Page*, 204 Ill. 2d 363 (2003), as support for defendants' argument that the futility exception does not apply in this case. The majority asserts that *Beahringer* is distinguishable from the case at bar. Notwithshable the differences between the two cases–indeed, *because* of one of them–*Beahringer* is highly relevant to the futility question here.

In *Beahringer*, the plaintiff inmate filed a grievance over the confiscation of his art supplies by the Illinois Department of Corrections (Department). Under the relevant administrative code provision, a decision on the grievance was required within 45 days "whenever possible." The plaintiff waited 60 days without receiving a decision or a response, and then filed a complaint for declaratory and injunctive relief. In his complaint, the plaintiff alleged, among other things, that the Department's grievance procedure was futile in his case because it was the warden who initially approved the confiscation of his art supplies, and grievances filed against warden-approved actions "historically have failed." *Beahringer*, 204 Ill. 2d at 378.

*Beahringer* held that the plaintiff failed to exhaust his administrative remedies, and the futility exception did not apply. The court stated:

"Illinois recognizes a limited 'futility' exception to the exhaustion of administrative remedies doctrine. A party will not be required to exhaust his or her administrative remedies when it would be patently useless to do so. [Citation.] 'However, the fact that there are clear indications that the agency may or will rule adversely is generally inadequate to terminate the administrative process or to avoid the exhaustion requirement.' " *Beahringer*, 204 Ill. 2d at 378.

In *Beahringer*, the futility exception was held not to apply even though the plaintiff alleged that grievances filed against warden-approved actions historically had failed. In the case at bar, by contrast, there is no indication that requests for section 11 variances have historically failed. Indeed, there is no indication that the Director ever rejected a variance request from a party or parties, situated similarly to plaintiffs, who refused on moral grounds to dispense emergency contraceptives. *Beahringer* is clearly relevant in determining whether the futility exception applies in the instant case.

I would hold that neither this exception nor the exception for facial challenges applies. The court's conclusions to the contrary ignore the important policy considerations underlying the exhaustion doctrine, which include: (1) allowing the agency to fully develop and consider the facts of the cause and to utilize its expertise; (2) protecting agency processes from impairment by avoidable interruptions; (3) giving the aggrieved party the opportunity to succeed before the agency; and (4) allowing the agency to correct its own errors, thus conserving valuable judicial resources. *Beahringer*, 204 Ill. 2d at 375. Moreover, this court has repeatedly stated that cases should be decided on nonconstitutional grounds whenever possible, and constitutional issues should be reached only as a last resort. *In re E.H.*, 224 Ill. 2d 172, 178 (2006). The doctrine of exhaustion of administrative remedies furthers this consideration as well.

If plaintiffs in the case at bar had sought a variance, this would have allowed the Director, at a minimum, "to fully develop and consider the facts of the cause and to utilize [his] expertise." *Beahringer*, 204 Ill. 2d at 375. The Director could have determined, for example, whether the application of the rule to plaintiffs would have been unreasonable or unnecessarily burdensome, and whether

granting the variance would have resulted in injury to any party. 225 ILCS 85/11(c) (West 2004); 68 Ill. Adm. Code §1330.110(a) (2005). In addition, plaintiffs would have had an opportunity to succeed before the Director, and thus avoid the need for judicial involvement.

I acknowledge that the question posed by plaintiffs' appeal–whether subsection (j) may validly require the dispensation of emergency contraceptives in the face of religious objections–is an interesting one. However, in view of the important policy reasons supporting the exhaustion doctrine, including our long-standing policy that constitutional issues should be reached only where necessary to decide the case, it is improper for this court to address the subsection (j) question before the Director is given an opportunity to consider it via the section 11 variance procedure. I note, in addition, that plaintiffs are not without a remedy. Under section 11, they may seek a variance excusing their compliance with subsection (j). If unsuccessful, they may then seek judicial relief.

I would affirm the judgment of the appellate court upholding the circuit court's dismissal of plaintiffs' complaint. I respectfully dissent.

JUSTICE BURKE joins in this dissent.