# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*Morr-Fitz, Inc. v. Quinn*, 2012 IL App (4th) 110398

| | |
|---|---|
| Appellate Court Caption | MORR-FITZ, INC., an Illinois Corporation, d/b/a FITZGERALD PHARMACY, Licensed and Practicing in the State of Illinois as a Pharmacy; L. DOYLE, INC., an Illinois Corporation, d/b/a EGGELSTON PHARMACY, Licensed and Practicing in the State of Illinois as a Pharmacy; KOSIROG PHARMACY, INC., an Illinois Corporation, d/b/a KOSIROG REXALL PHARMACY, Licensed and Practicing in the State of Illinois as a Pharmacy; LUKE VANDER BLEEK; and GLENN KOSIROG, Plaintiffs-Appellees, v. PAT QUINN, Governor, The State of Illinois; FERNANDO E. GRILLO, Secretary, The Department of Financial and Professional Regulation; DANIEL E. BLUTHARDT, Acting Director, The Division of Professional Regulation; and THE MEMBERS OF THE STATE BOARD OF PHARMACY, in Their Official Capacities, Defendants-Appellants. |
| District & No. | Fourth District<br>Docket No. 4-11-0398 |
| Argued | August 7, 2012 |
| Filed | September 20, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The injunction issued by the trial court prohibiting defendant public officials from enforcing the administrative rule requiring pharmacies to dispense emergency contraception was affirmed to the extent the trial court found that the rule could not be enforced without violating the Conscience Act, but the injunction was reversed and modified to enjoin enforcement of the rule against plaintiffs who have conscience-based objections to the rule. |

| | |
|---|---|
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, No. 05-CH-495; the Hon. John W. Belz, Judge, presiding. |
| Judgment | Affirmed in part as modified and reversed in part. |
| Counsel on Appeal | Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Carl J. Elitz (argued) and Nadine J. Wichern, Assistant Attorneys General, of counsel), for appellants. |
| | Duane D. Young, of LaBarre, Young & Behnke, of Springfield, Francis J. Manion, of New Hope, Kentucky, and Carl Nichols, Steven Lehotsky, Natalie Hurt, Thomas Dettore, and Alyssza DaCunha, all of Wilmer, Cutler, Pickering, Hale & Dorr LLP, and Mark L. Rienzi (argued), of Catholic University of America, Columbus School of Law, both of Washington, D.C., for appellees. |
| Panel | JUSTICE KNECHT delivered the judgment of the court, with opinion. Justices Steigmann and Pope concurred in the judgment and opinion. |

## OPINION

¶ 1 Plaintiffs, two pharmacists and three corporations that own and operate pharmacies, filed suit seeking declaratory and injunctive relief against certain public officials who seek to enforce an administrative rule that requires pharmacies to dispense or aid in the dispensing of emergency contraception. The individual plaintiffs believe life begins at conception, emergency contraception may act as an abortifacient, and the dispensing of such medication is against their religious beliefs. The corporate plaintiffs have ethical guidelines that prevent the pharmacies they own and operate from dispensing emergency contraception.

¶ 2 The administrative rule at issue (Current Rule) does not specifically identify "emergency contraception" but applies to all medication approved by the United States Food and Drug Administration (FDA). 68 Ill. Adm. Code 1330.500(e) (2010). Plaintiffs' third amended complaint alleges the Current Rule is invalid as it violates the Illinois Health Care Right of Conscience Act (Conscience Act) (745 ILCS 70/1 to 14 (West 2010)), the Illinois Religious Freedom Restoration Act (Religious Freedom Act) (775 ILCS 35/1 to 99 (West 2010)), and the first amendment's free-exercise clause (U.S. Const., amend. I).

¶ 3    The circuit court found plaintiffs had sincere religious beliefs preventing them from dispensing emergency contraceptives. The court found the Current Rule unconstitutional and invalid under the Conscience Act and the Religious Freedom Act and issued a permanent injunction, enjoining defendants from enforcing the Current Rule. Defendants appeal, arguing (1) the injunction is overly broad in that it prohibits defendants from enforcing the Current Rule on other FDA-approved medications and against nonobjecting pharmacies; and (2) the Current Rule is constitutional and does not violate either the Conscience Act or the Religious Freedom Act. We agree the injunction is overly broad but find the Conscience Act prohibits enforcement of the Current Rule on the issue of emergency contraceptives against these plaintiffs.

¶ 4    We affirm in part as modified and reverse in part.

## I. BACKGROUND

### A. "Plan B" or "Emergency Contraceptives"

¶ 7    In their opening brief, defendants identified four products marketed in the United States and approved for sale by pharmacies: Plan B One-Step, ella, Next Choice, and levonorgestrel tablets. Each of these products is used to prevent "pregnancy in the few days after sex." http://ec.princeton.edu/questions/dose.html (visited Aug. 30, 2012). The parties refer to these medications collectively as "Plan B" or "emergency contraceptives." Plaintiffs' exhibits, including product labeling approved by the FDA, show emergency contraception may curtail pregnancy by preventing the release of an egg, preventing fertilization, or preventing a fertilized egg from attaching. The FDA's official Web site acknowledges Plan B may prevent a fertilized egg from attaching. See *Morr-Fitz, Inc. v. Blagojevich*, 231 Ill. 2d 474, 480 n.1, 901 N.E.2d 373, 379 n.1 (2008) (quoting http://www.fda.gov/CDER/drug/infopage/planB QandA.htm). These contraceptives will not work if a fertilized egg is implanted.

### B. Parties in the Litigation

¶ 9    Plaintiffs in this litigation include two individual pharmacists and corporations that own "community pharmacies." The plaintiff individuals are Luke Vander Bleek and Glen Kosirog, licensed Illinois pharmacists. Vander Bleek, a lifelong Roman Catholic, has been a pharmacist for over 20 years. Kosirog, a Christian since age 17, has been a pharmacist for over 25 years. Both Vander Bleek and Kosirog have religious-based objections to participating in any way in dispensing emergency contraceptives due to their beliefs these contraceptives may prevent a fertilized egg from attaching to a woman's uterus. The individual plaintiffs were added to the case with the first amended complaint.

¶ 10   Three corporate plaintiffs are in this case: Morr-Fitz, Inc., L. Doyle, Inc., and Kosirog Pharmacy, Inc. Vander Bleek is the sole shareholder of Morr-Fitz, which operates a pharmacy in Morrison. L. Doyle, Inc., has two shareholders. Vander Bleek is the majority shareholder. L. Doyle operates two pharmacies as Eggelston Pharmacy. One is located in Sycamore and the other in Genoa. Kosirog Pharmacy, Inc., has one shareholder, Kosirog. It operates one pharmacy, Kosirog Rexall Pharmacy, in Chicago.

¶ 11                                        C. Defendants

¶ 12       Defendants involved in this appeal are the following: Pat Quinn, Governor of Illinois; Brent E. Adams, Secretary of the Illinois Department of Financial and Professional Regulation (Department); Jay Steward, Director of the State Board of Pharmacy; and the State Board of Pharmacy. Throughout the litigation, these defendants were substituted in place of other defendants who occupied the same offices, including Governor Rod Blagojevich, Secretary Fernando Grillo, Secretary Dean Martinez, and Director Daniel Bluthardt.

¶ 13                       D. "Emergency Rule" and "Permanent Rule"

¶ 14       In April 2005, Governor Rod Blagojevich filed an "Emergency Rule" amending then-section 1330.91 of title 68 of the Illinois Administrative Code. 29 Ill. Reg. 5586 (emergency rule eff. Apr. 1, 2005). In August 2005, the amendment became permanent in the form of an administrative rule. This rule (Permanent Rule) mandated the following of community pharmacies:

> "1) Upon receipt of a valid, lawful prescription for a contraceptive, a pharmacy must dispense the contraceptive *** to the patient or the patient's agent without delay, consistent with the normal timeframe [*sic*] for filling any other prescription. If the contraceptive *** is not in stock, the pharmacy must obtain the contraceptive under the pharmacy's standard procedures for ordering contraceptive drugs not in stock, including the procedures of any entity that is affiliated with, owns, or franchises the pharmacy. However, if the patient prefers, the prescription must be transferred to a local pharmacy of the patient's choice under the pharmacy's standard procedures for transferring prescriptions for contraceptive drugs, including the procedures of any entity that is affiliated with, owns, or franchises the pharmacy. Under any circumstances an unfilled prescription for contraceptive drugs must be returned to the patient if the patient so directs." 29 Ill. Reg. 13639, 13663 (eff. Aug. 25, 2005).

In section (j), the term "contraceptive" refers to all FDA-approved drugs that prevent pregnancy (29 Ill. Reg. 13639, 13663 (eff. Aug. 25, 2005)), including medications commonly identified as "emergency contraceptive pills" or "emergency contraception."

¶ 15       When the Emergency Rule was promulgated, Governor Blagojevich "publicly warned that Illinois pharmacists who violate the rule face significant penalties, ranging from fines to the loss of professional licenses." *Morr-Fitz*, 231 Ill. 2d at 481, 901 N.E.2d at 380. On April 13, 2005, Governor Blagojevich issued a press release stating, " 'If a pharmacy wants to be in the business of dispensing contraceptives, then it must fill prescriptions without making moral judgments.' " *Morr-Fitz*, 231 Ill. 2d at 482, 901 N.E.2d at 380 (quoting press release of Governor Blagojevich, April 13, 2005).

¶ 16                                    E. The Litigation

¶ 17    In September 2005, plaintiffs Morr-Fitz, Inc., and Kosirog Pharmacy, Inc., filed a complaint for declaratory and injunctive relief against defendants. Plaintiffs, maintaining emergency contraceptives act as abortifacients, asked the court to enjoin defendants from enforcing the Permanent Rule, arguing the rule conflicts with Illinois law. Plaintiffs maintained the rule was void under the Conscience Act (745 ILCS 70/1 to 14 (West 2004)) and the Religious Freedom Act (775 ILCS 35/1 to 99 (West 2004)). After the circuit court denied plaintiffs' request for a temporary restraining order on grounds of standing and ripeness, plaintiffs sought leave in October 2005 to amend the complaint.

¶ 18    In the proposed first amended complaint, plaintiffs added a claim the Permanent Rule substantially burdened plaintiffs' first-amendment rights to free exercise of religion. Plaintiffs maintained the Permanent Rule forced them to participate in abortions to which they were religiously and conscientiously opposed.

¶ 19    In November 2005, the circuit court granted plaintiffs leave to amend, as well as defendants' motion to dismiss on grounds of ripeness, lack of standing, and failure to exhaust administrative remedies. Plaintiffs appealed. By majority, this court, in *Morr-Fitz, Inc. v. Blagojevich*, 371 Ill. App. 3d 1175, 1184, 867 N.E.2d 1164, 1171 (2007), determined the issue was not ripe and affirmed the judgment. The majority concluded the plaintiffs had not pleaded facts establishing they felt the effects of the rule in a concrete way and would suffer a substantial hardship if they were not allowed to pursue their claim. *Morr-Fitz*, 371 Ill. App. 3d at 1184, 867 N.E.2d at 1171. The majority further concluded neither the Conscience Act nor the Religious Freedom Act made the claim ripe. *Morr-Fitz*, 371 Ill. App. 3d at 1184, 867 N.E.2d at 1171. Justice Turner dissented, finding plaintiffs' claims ripe and compelling under the Conscience Act and the Religious Freedom Act. *Morr-Fitz*, 371 Ill. App. 3d at 1185-86, 867 N.E.2d at 1172-73 (Turner, J., dissenting). Plaintiffs appealed.

¶ 20    While plaintiffs' petition for appeal to the Supreme Court of Illinois was pending, the Permanent Rule espoused in subsection (j) was amended (Second Permanent Rule) (32 Ill. Reg. 7116, 7126-27 (eff. Apr. 16, 2008)). The Department added "several, more onerous provisions pertaining specifically to 'emergency contraception.' " *Morr-Fitz*, 231 Ill. 2d at 486, 901 N.E.2d at 382. The Second Permanent Rule mandated retail pharmacies use their "best efforts to maintain adequate stock of emergency contraception to the extent that it continues to sell contraception." 32 Ill. Reg. 7116, 7127 (eff. Apr. 16, 2008). It further mandated if a pharmacist objected to the dispensing of emergency contraception and no nonobjecting pharmacist was present at the pharmacy, the "dispensing pharmacy" must sell the emergency contraceptive through " 'remote medication order processing,' " which involved having a nonobjecting pharmacist at another location authorize a nonpharmacist employee at the dispensing pharmacy to dispense the drug. 32 Ill. Reg. 7116, 7127 (eff. Apr. 16, 2008). The Second Permanent Rule further required retail pharmacies ensure a nonobjecting pharmacist was scheduled when the pharmacy was open or a licensed pharmacist was available to perform the remote-medication-order-processing procedure when no nonobjecting pharmacist was available at the dispensing pharmacy. 32 Ill. Reg. 7116, 7132 (eff. Apr. 16, 2008).

¶ 21 In December 2008, the Supreme Court of Illinois reversed the majority's decision in *Morr-Fitz*, 371 Ill. App. 3d at 1184, 867 N.E.2d at 1171, finding plaintiffs' claims ripe. *Morr-Fitz*, 231 Ill. 2d at 504-05, 901 N.E.2d at 392-93. The court further determined plaintiffs were not required to exhaust administrative remedies and remanded the cause for a hearing on plaintiffs' motion for a preliminary injunction and further amendments to the complaint. *Morr-Fitz*, 231 Ill. 2d at 504-05, 901 N.E.2d at 392-93.

¶ 22 In August 2009, the circuit court granted plaintiffs a preliminary injunction, prohibiting defendants from enforcing the Second Permanent Rule against plaintiffs.

¶ 23 In April 2010, defendants issued the Current Rule, entitled "Community Pharmacy Services," which replaced the Second Permanent Rule. See 68 Ill. Adm. Code 1330.500 (2010). Emergency contraceptives are not mentioned in the Current Rule. Section (e), however, mandates "Pharmacies have a duty to deliver lawfully prescribed drugs to patients and to distribute nonprescription drugs approved by the [FDA] for restricted distribution by pharmacies, or to substitute a generic drug *** in a timely manner, or to contact the prescriber to obtain authorization to dispense a different drug that produces a similar clinical effect in a timely manner ***." 68 Ill. Adm. Code 1330.500(e) (2010). The Current Rule includes exceptions to this requirement, but it does not list conscience- or religious-based objections. The listed exceptions include matters of professional judgment, such as when drug-drug interactions or drug-food interactions are indicated (68 Ill. Adm. Code 1330.500(e)(1) (2010)) and when emergencies affect drug availability (68 Ill. Adm. Code 1330.500(e)(2) (2010)). Section (g) mandates if a lawfully prescribed drug or nonprescription drug is not in stock or is otherwise unavailable, the pharmacy must provide the patient a timely alternative for appropriate therapy, which may include obtaining the drug. 68 Ill. Adm. Code 1330.500(g) (2010). Suggested alternatives include, if the patient requests it, transmitting the prescription information to a pharmacy that will fill the prescription. 68 Ill. Adm. Code 1330.500(g)(3) (2010). A pharmacy that fails to comply with the Current Rule is subject to disciplinary action "or other enforcement actions." 68 Ill. Adm. Code 1330.500(h) (2010).

¶ 24 In May 2010, plaintiffs filed a third amended complaint and a summary-judgment motion seeking relief against the Current Rule. In their third amended complaint, plaintiffs maintained the Current Rule violated the Conscience Act, the Religious Freedom Act, and the first amendment. Before trial, the circuit court granted the parties' joint motion in which defendants agreed not to pursue disciplinary action for violations of the previous rules and plaintiffs agreed to voluntarily dismiss claims made under Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e to 2000e-17 (2006)) and the Illinois Human Rights Act (775 ILCS 5/1-101 to 10-104 (West 2010)).

¶ 25 In March 2011, a trial was held. Plaintiffs Vander Bleek and Kosirog testified for plaintiffs; Dr. Warren Wallace and Secretary Adams testified for defendants.

¶ 26 Plaintiff Vander Bleek, a pharmacist who resides in Morrison, testified he had been a pharmacist since 1986. He owned three pharmacies, with locations in Morrison, Sycamore, and Genoa. Vander Bleek is Roman Catholic and regularly attended church.

¶ 27 Vander Bleek testified he was aware of emergency contraceptives. He believed his faith

prevented him from participating in the sale of emergency contraception because it has the potential for terminating human life. Vander Bleek believed human life begins at conception, and the FDA-approved product literature on the Plan B products indicates such medication may prevent pregnancy after fertilization. Vander Bleek testified his faith prevented him from selling emergency contraception and also from permitting his stores to stock the drugs or participating in a system through which he would transfer the prescription to another store to be filled.

¶ 28    According to Vander Bleek, his pharmacies had guidelines concerning emergency contraception. In May 2005, by letter, he informed his staff of this policy. Vander Bleek asked any pharmacist who worked for him to sign the policy. Since 2005 approximately three or four women had asked for emergency contraception in his Morrison store. About the same number had asked for those drugs in his other two stores combined.

¶ 29    Vander Bleek testified, upon hearing Governor Blagojevich's comments about the change in the law, he felt like he would have to choose between violating the law or his conscience. Vander Bleek watched an interview of Governor Blagojevich on television, when the governor said pharmacists unwilling to dispense emergency contraception should find a new job.

¶ 30    Vander Bleek testified the nearest location to his Morrison store where a woman could obtain emergency contraception was approximately 3 1/2 blocks away. This location was an inpatient pharmacy at a public hospital, which stocked Plan B in the emergency room. The nearest pharmacy, however, was approximately 14 miles away. More than 12 pharmacies were within a 15-minute drive of the Morrison location. Regarding the Sycamore and Genoa locations, Vander Bleek testified a Walgreen's was approximately 10 minutes from his Genoa pharmacy and 5 minutes from his Sycamore store. Prescription emergency contraception was also available on the Internet.

¶ 31    Glenn Kosirog, a registered pharmacist for over 25 years and a resident of Wheaton, testified he was the sole shareholder in a corporation that owns Kosirog Pharmacy, a pharmacy that had been in his family over 50 years. Kosirog testified he had been a Christian since he was 17 years old. Kosirog believed emergency contraceptives to be "abortion pills," as emergency contraception taken after unprotected sex could destroy an embryo. Kosirog believed life begins at conception. Kosirog, because of his faith, could not have anything to do with emergency contraceptives.

¶ 32    Kosirog testified his store, since 2006 or 2007, had an "abortion pill policy." This policy requires a pharmacist, if presented with a prescription for emergency contraception, to return the prescription. Kosirog testified one or two women each month entered his store seeking emergency contraception. Over 12 pharmacies were within three or four miles of his Chicago pharmacy.

¶ 33    When Kosirog first learned of the requirement to sell emergency contraception, he felt coerced and frightened. He was concerned the government might close his pharmacy because of his beliefs. Because of the uncertainty surrounding the rules, he did not expand his business.

¶ 34    Warren Henry Wallace, a physician at Northwestern University Medical School, testified

as an expert witness for defendants. Dr. Wallace testified he practiced medicine for 35 years. When he prescribed a medication for a patient, he expected the prescription would be filled and the patient would take it. Dr. Wallace would not inform a pharmacist of the reasons for the prescription and described situations where a woman's life and health would be endangered by a pregnancy. Dr. Wallace testified the failure to take emergency contraceptives in a timely manner "may lead to increased risk that it will be ineffective." When asked about the optimal time frame for taking emergency contraceptives, Dr. Wallace testified they were most effective when taken immediately after unprotected intercourse and "become[ ] progressively less effective over the course of the next several days."

¶ 35    Dr. Wallace testified he heard the term "dispensary" used to refer to a pharmacy. He agreed physicians were free to refuse to enter into physician-patient relationships for conscience-based reasons and pharmacists should have that same right. Dr. Wallace testified until April 2010 there had not been a rule requiring every pharmacy to sell every drug. In his own personal experience, he was not aware of any instance in which a religious refusal to sell emergency contraceptives resulted in the woman's failure to obtain the drug.

¶ 36    Brent Adams, the secretary of financial professional regulation for the State of Illinois, testified he had been with the Department since July 2006. In October 2009, he was confirmed as secretary. In his role as secretary, Secretary Adams helped determine the Department's policy initiatives and directives.

¶ 37    Secretary Adams testified he drafted the Current Rule. Secretary Adams explained the prior rules were repealed as part of "a comprehensive rewrite of the rules in the context of amendments to the Pharmacy Practice Act [(225 ILCS 85/1 to 41 (West 2010))]." Upon learning of the Ninth Circuit's decision in *Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009), in which rules broadly expanding access to medications survived constitutional scrutiny, he decided to move in the same direction. The Current Rule was drafted "to promote the health and well-being of residents" and "to establish a regulatory framework that would protect access to medications for all Illinois residents." Secretary Adams testified his concern was with access to medication in general, but matters of Plan B contraception were also discussed, as were matters of postexposure prophylaxis for human immunodeficiency virus (HIV) infection and psychotropic medications. Secretary Adams was not aware of any particular instance when a patient was denied emergency contraceptives because of a religious-based objection, but he "was aware of general controversy." His "concern was that at some future point, a patient in need of timely access to one of those remedies would be denied and *** the complaint process via the Department would not redress that concern in an adequate time frame."

¶ 38    Secretary Adams testified the duty to deliver applies to the pharmacy, not to pharmacists. The Department would learn of violations through consumer complaints. After a consumer filed a complaint, the Department would conduct an investigation and make a report to the prosecution if necessary. Pharmacies were responsible for drug delivery because they were the frontline deliverers of necessary medication. Pharmacists, individually, were not covered under the rule to address religious objections. Secretary Adams was unaware of any customer complaints under the previous rules regarding religious-based refusals to dispense emergency contraceptives.

¶ 39 Secretary Adams testified the Current Rule did not require doctors to write prescriptions for drugs. He acknowledged access to medication could be denied if a doctor refused to write a prescription. Secretary Adams testified his Department had a variance procedure that allowed him to make individualized assessments for parties seeking a variance. He could not foresee a situation in which he would give a variance for a religious objection.

¶ 40 Secretary Adams, in the process of drafting the Current Rule, met with the Retail Merchants Foundation, at least one pharmacist association, and Planned Parenthood. Secretary Adams did not meet with religious objectors. Secretary Adams testified he kept all of the materials related to the Current Rule in a file under the heading "Plan B." Secretary Adams could envision a health issue in which a patient is in need of medication and arrives at a pharmacy and is denied access. Secretary Adams agreed his rule did not require the pharmacy to stock the drug. He agreed timely therapeutic equivalent in some instances might mean the same day, but timeliness would depend on the circumstances. Secretary Adams would not agree the public hospital's selling the drug three blocks away was an alternative for Vander Bleek's refusal to sell emergency contraception at his pharmacy: "I find it unreasonable to expect a patient who is denied access at a pharmacy to think to go to the emergency room."

¶ 41 The circuit court found plaintiffs Vander Bleek and Kosirog had sincere religious- and conscience-based objections to participating in the distribution of the Plan B contraceptives. The court concluded the Current Rule is invalid on its face and as applied under the Conscience Act, the Religious Freedom Act, and the first amendment. The court entered judgment for plaintiffs on counts I, IV, and VI of the third amended complaint and permanently enjoined defendants and "those acting in concert" with them from enforcing the Current Rule. The court found no just reason for delaying the appeal. The court further issued a stay on the enforcement of the judgment but found the preliminary injunction that had been previously issued remained in effect until the matter is fully litigated on appeal.

¶ 42 This appeal followed.

¶ 43 II. ANALYSIS

¶ 44 A. Injunctive Relief

¶ 45 On appeal, defendants first ask this court to find the injunction overly broad and vacate it. Defendants maintain the injunction, as written, prevents the Department from enforcing the Current Rule against pharmacies with no conscience- or religious-based objections to emergency contraceptives. Defendants, citing *Stormans*, 586 F.3d at 1140, argue such an order is an abuse of discretion and should be overturned.

¶ 46 Plaintiffs disagree. Plaintiffs, citing *Morr-Fitz*, 231 Ill. 2d at 498, 901 N.E.2d at 389, argue if the Current Rule is facially illegal, then the circuit court must void the enactment in its entirety. Plaintiffs further maintain because the Current Rule does not contain an exemption for religious beliefs, it is also facially invalid and must be vacated. Plaintiffs conclude by arguing even if this court were to find the circuit court's injunction overbroad, this court may modify the injunction to conform with the legal rights of those involved. See *Stampede Tool Warehouse, Inc. v. May*, 272 Ill. App. 3d 580, 591, 651 N.E.2d 209, 217-18

(1995).

¶ 47 Resolution of this argument ultimately depends upon the resolution of the other issues in this case. We will return to this issue upon resolution of the others.

¶ 48                                    B. Conscience Act

¶ 49 In their opening brief, defendants next ask the court to find the Current Rule does not violate the free-exercise clause of the first amendment. Defendants argue the Current Rule is facially neutral, applies generally, and easily survives rational-basis review. In the alternative, defendants contend the Current Rule survives a strict-scrutiny test because the State has a compelling interest in establishing a uniform system of efficient local drug distribution and the Current Rule is narrowly tailored to satisfy that interest.

¶ 50 We decline defendants' invitation to begin with this constitutional issue. We should avoid constitutional questions when the case may be decided on other grounds. See *Innovative Modular Solutions v. Hazel Crest School District 152.5*, 2012 IL 112052, ¶ 38, 965 N.E.2d 414. We begin with the question of whether the Current Rule violates statutory law, starting with our consideration of the Conscience Act.

¶ 51 In 1977, the General Assembly enacted the Conscience Act. See Pub. Act 80-616, § 2 (eff. Sept. 13, 1977). In so doing, the General Assembly declared, "It is the public policy of the State of Illinois to respect and protect the right of conscience of all persons who refuse to obtain, receive or accept, or who are engaged in, the delivery of, arrangement for, or payment of health care services and medical care whether acting individually, corporately, or in association with other persons ***." 745 ILCS 70/2 (West 2010).

¶ 52 Consistent with this policy, the General Assembly, in the Conscience Act, determined "[n]o physician or health care personnel shall be civilly or criminally liable to any person, estate, public or private entity or public official by reason of his or her refusal to perform, assist, counsel, suggest, recommend, refer or participate in any way in any particular form of health care service which is contrary to the conscience of such physician or health care personnel." 745 ILCS 70/4 (West 2010). The General Assembly further made it unlawful for public officials to discriminate against any person, in any manner, in licensing "because of such person's conscientious refusal to receive, obtain, accept, perform, assist, counsel, suggest, recommend, refer or participate in any way in any particular form of health care services contrary to his or her conscience." 745 ILCS 70/5 (West 2010). "Conscience" is defined as "a sincerely held set of moral convictions arising from belief in and relation to God, or which, though not so derived, arises from a place in the life of its possessor parallel to that filled by God among adherents to religious faiths." 745 ILCS 70/3(e) (West 2010).

¶ 53 The American Civil Liberties Union (ACLU) of Illinois, in its *amicus* brief, urges this court to interpret and apply the Conscience Act according to the parameters of the Religious Freedom Act. ACLU reasons the Religious Freedom Act was enacted after the Conscience Act and is more specific and the Conscience Act provides no guidelines that permit the allowance of competing interests.

¶ 54 We find these arguments unconvincing. Section 15 of the Religious Freedom Act provides the State "may not substantially *burden* a person's exercise of religion, even if the

-10-

burden results from a rule of general applicability, unless it demonstrates that application of the burden to the person (i) is in furtherance of a compelling governmental interest and (ii) is the least restrictive means of furthering that compelling governmental interest." (Emphasis added.) 775 ILCS 35/15 (West 2010). It does not apply here. The General Assembly, in enacting the Conscience Act, did "not substantially burden a person's exercise of religion," but instead bolstered it, by offering protections to those who seek not to act in the health-care setting due to religious convictions. The Conscience Act is more specific than the Religious Freedom Act because the Conscience Act deals specifically with the issue of health care, while the Religious Freedom Act would apply to any governmental action that "substantially burden[s] a person's exercise of religion" (775 ILCS 35/15 (West 2010)).

¶ 55     ACLU of Illinois contends, however, the State must be permitted to weigh the interests of women who seek emergency contraceptives against those of pharmacists whom the State should be able to command to dispense medications at the woman's or physician's request. We agree the State as a whole has this authority. However, we do not agree defendants, as part of the executive branch of the State, necessarily have this authority here. This is not a case where the "State" has made *one* decision on the issue, but where the "State" has made *two* decisions. The executive branch decided to make Plan B available over any pharmacist's religious concerns, while the legislative branch decided to protect health-care personnel and health-care facilities from having to provide health care against their conscience or religious beliefs. We must decide whether the two decisions (*i.e.*, the Current Rule and the Conscience Act) act in harmony. If not, the Conscience Act prevails. See *Holtkamp Trucking Co. v. David J. Fletcher, M.D., L.L.C.*, 402 Ill. App. 3d 1109, 1126, 932 N.E.2d 34, 48 (2010) (" 'Whenever an administrative rule conflicts with a statute, the rule will be held invalid and the statute followed.' " (quoting *Greaney v. Industrial Comm'n*, 358 Ill. App. 3d 1002, 1026, 832 N.E.2d 331, 352 (2005))).

¶ 56              1. *The Conscience Act Applies to the Practice of Pharmacy*

¶ 57     Defendants argue the Conscience Act does not apply in this case because pharmacists and pharmacies are not protected by its provisions. Defendants maintain the words "pharmacy" and "pharmacist" do not appear in the statute and the Act defines "health care" as treatment rendered only by "physicians, nurses, paraprofessionals or [a] health care facility." Defendants contend the issue of whether pharmacists are paraprofessionals is ambiguous and urges this court to examine the legislative history to resolve the ambiguity. While the terms "pharmacy" and "pharmacist" do not appear in the text, plaintiffs contend the plain language of the Conscience Act establishes it applies to them and there is no ambiguity.

¶ 58     The main "goal of statutory interpretation is to ascertain and give effect to the legislature's intent." *Lauer v. American Life Family Insurance Co.*, 199 Ill. 2d 384, 388, 769 N.E.2d 924, 926 (2002). The statutory language itself, given its plain and ordinary meaning, is the best indication of legislative intent. *Lauer*, 199 Ill. 2d at 388, 769 N.E.2d at 926. When the statutory language is clear, we will give it effect without resorting to other aids of construction. *Hadley v. Illinois Department of Corrections*, 224 Ill. 2d 365, 371, 864 N.E.2d 162, 165 (2007).

¶ 59    Section 3 of the Conscience Act defines "health care" as follows:

" 'Health care' means any phase of patient care, including but not limited to, testing; diagnosis; prognosis; ancillary research; instructions; family planning, counselling, referrals, or any other advice in connection with the use or procurement of contraceptives and sterilization or abortion procedures; medication; or surgery or other care or treatment rendered by a physician or physicians, nurses, paraprofessionals or health care facility, intended for the physical, emotional, and mental well-being of persons[.]" 745 ILCS 70/3(a) (West 2010).

¶ 60    A federal district court, in *Vandersand v. Wal-Mart Stores, Inc.*, 525 F. Supp. 2d 1052, 1057 (C.D. Ill. 2007), rejected the same argument made by defendants. In *Vandersand*, the plaintiff, a licensed pharmacist in Illinois, argued his employer, Wal-Mart, wrongfully terminated his employment after he refused to dispense an emergency contraceptive based on his understanding the drug acted "with a significant abortifacient mechanism" and his religious beliefs did not permit him to dispense the drug. *Vandersand*, 525 F. Supp. 2d at 1053, 1054-55. The plaintiff filed a complaint alleging, in part, his termination violated the Conscience Act. *Vandersand*, 525 F. Supp. 2d at 1055. Wal-Mart moved to dismiss plaintiff's complaint, arguing, as defendants do here, the Conscience Act only protects treatment provided by physicians, nurses, paraprofessionals, or health-care facilities. *Vandersand*, 525 F. Supp. 2d at 1057. The district court rejected this argument upon concluding Wal-Mart took the limiting language from the last clause of the "health care" definition in section 3 and that clause refers only to "surgery or other care or treatment," and not to the entire list of "health care" services appearing before it. *Vandersand*, 525 F. Supp. 2d at 1057. The district court found such language did not apply to "family planning" and "medication" and anyone who refused to participate in providing medication because of his conscience is protected by the Conscience Act. *Vandersand*, 525 F. Supp. 2d at 1057.

¶ 61    We agree with the analysis in *Vandersand*. The statutory language is clear and the limiting language upon which defendants rely does not apply to "medication." Section 5 of the Conscience Act prohibits discrimination in licensing against anyone "because of such person's conscientious refusal to receive, obtain, accept, perform, assist, counsel, suggest, recommend, refer or participate in any way in any particular form of health care [(*i.e.*, medication)] services contrary to his or her conscience." 745 ILCS 70/5 (West 2010).

¶ 62    We further find section 4 of the Conscience Act bars civil or criminal actions against plaintiffs for their refusal to dispense Plan B medication. Section 4, quoted above, protects "health care personnel" from civil and criminal liability when such personnel refuse to act according to their conscience. 745 ILCS 70/4 (West 2010). Section 3(c) of the Conscience Act defines "health care personnel" as "any nurse, nurses' aide, medical school student, professional, paraprofessional or *any other person who furnishes, or assists in the furnishing of, health care services*." (Emphasis added.) 745 ILCS 70/3(c) (West 2010). A pharmacist is a person who furnishes or assists in furnishing health-care services, *i.e.*, the provision of medication.

¶ 63    Finding the statutory language clearly applies to the provision of "medication" services, we need not attempt to interpret the term "paraprofessionals." We note defendants, in arguing

-12-

the statute is ambiguous toward pharmacists, urged this court to find persuasive the comments of one representative on the floor of the House of Representatives, who stated pharmacists and pharmacies were specifically excluded, on their own request, from the Conscience Act. Such statements might be minimally persuasive if we found this provision of the Conscience Act ambiguous and if the statements were not made approximately *20 years after* the Conscience Act was enacted. See 90th Ill. Gen. Assem., House Proceedings, Apr. 14, 1997, at 40-41.

¶ 64 Plaintiffs next argue sections 9 and 10 of the Conscience Act (745 ILCS 70/9, 10 (West 2010)) similarly protect the corporate plaintiffs, who manage "health care facilities" from government action under the Current Rule. Plaintiffs maintain pharmacies fall within the definition of "health care facilities" as they are "dispensaries" or, in the alternative, "location[s] wherein health care services are provided to any person." Defendants maintain the term "dispensaries" refers to a part of a larger institution, such as a school, hospital, or factory. Defendants further maintain there is ambiguity in the term "health care facilities" and urges this court to follow the same legislative history cited above.

¶ 65 Section 9 provides, in part, no person or corporation that owns or operates a "health care facility" shall be liable to any public entity by reason of the health-care facility's refusal to provide any particular form of health-care service that violates the facility's conscience as set forth in its ethical guidelines or other governing documents. 745 ILCS 70/9 (West 2010). Section 10, in part, makes it unlawful for a public official to discriminate against any corporation who operates "an existing health care facility" in any way, including in licensing, because the corporation refused to permit "any particular form of health care service which violates the health care facility's conscience as documented in its existing or proposed ethical guidelines" or other governing documents. 745 ILCS 70/10 (West 2010).

¶ 66 Section 3(d) of the Conscience Act defines "health care facility" as follows:

"any public or private hospital, clinic, center, medical school, medical training institution, laboratory or diagnostic facility, physician's office, infirmary, dispensary, ambulatory surgical treatment center or other institution or location wherein health care services are provided to any person, including physician organizations and associations, networks, joint ventures, and all other combinations of those organizations." 745 ILCS 70/3(d) (West 2010).

¶ 67 Defendants cite two definitions for "dispensary" to support their argument dispensaries generally refer to areas part of a larger institution. The first is from Webster's Third New International Dictionary 653 (1993): "a place where medicines or medical or dental aid are dispensed to ambulant patients (a [dispensary] in an industrial plant)." The second definition comes from American Heritage Dictionary: "[a]n office in a hospital, school, or other institution from which medical supplies and preparations are dispensed." American Heritage Dictionary 406-07 (2d coll. ed. 1985).

¶ 68 Plaintiffs emphasize the definitions for "dispensary" and "pharmacy" prove the terms are synonymous. Plaintiffs, citing Webster's Third New International Dictionary 653 and 1694 (1971), contend "dispensary" is defined as "a place where medicines *** are dispensed" and "pharmacy" is defined as "a place where medicines are *** dispensed." Plaintiffs point to

-13-

defendants' expert witness's testimony, in which Dr. Wallace acknowledged he heard the term "dispensary" used in reference to a pharmacy. Plaintiffs further cite section 3 of the Pharmacy Practice Act, which defines "pharmacy" as a place where pharmacist care is provided and where medicines are dispensed or where a sign is affixed using words such as " 'Pharmacist,' " " 'Pharmacy,' " or " 'Dispensary.' " See Pub. Act 97-813, § 415 (eff. July 13, 2012) (amending 225 ILCS 85/3(a) (West Supp. 2011)).

¶ 69    We find a "pharmacy" is a "dispensary." A dispensary is "a place where medicine or medical or dental treatment is dispensed." http://www.merriam-webster.com/dictionary/dispensary (visited Aug. 30, 2012). A pharmacy is "a place where medicines are compounded or dispensed." http://www.merriam-webster.com/dictionary/pharmacy (visited Aug. 30, 2012). Given the language of the Conscience Act, the General Assembly plainly intended to protect those institutions or organizations which dispense medication from having to act against their consciences. It would be a tortured interpretation to conclude individuals who dispense medicines inside a hospital or school are protected while individuals who dispense medicines outside the hospital or school are not. Pharmacies and pharmacists fall within the protections of the Conscience Act.

¶ 70    We further find convincing the argument a pharmacy is a "location wherein health care services are provided to any person." As we determined above, the definition of "health care" includes "medication." 745 ILCS 70/3(a) (West 2010). Because a pharmacy is a location where medication services are provided, it is a "health care facility" as defined in the Conscience Act. See 745 ILCS 70/3(d) (West 2010).

¶ 71    *2. The Provision of "Emergency Contraceptives" Is Not*
*"Emergency Medical Care" Contemplated by the Conscience Act*

¶ 72    Defendants argue, even if the Conscience Act applies to pharmacies and pharmacists, it does not permit them to refuse to provide emergency-contraceptive care. Defendants emphasize the Conscience Act specifically states in sections 6 and 9, "Nothing in this Act shall be construed so as to relieve a physician or other health care personnel from obligations under the law of providing emergency medical care." 745 ILCS 70/6, 9 (West 2010). Defendants contend, because "every hour counts" in the effectiveness of Plan B contraceptives, the provision of emergency contraceptives falls within this exception.

¶ 73    Plaintiffs contend the language in sections 6 and 9 does not permit the Current Rule to stand. Plaintiffs contend the provisions mean the Conscience Act will not excuse health-care personnel from any independent legal obligation they may otherwise have to provide medical care and defendants have failed to identify any independent legal obligation on pharmacies or pharmacists to provide such care. Plaintiffs further contend a patient's need to maximize the drug's effectiveness within 72 hours is not proof of emergency medical care.

¶ 74    We disagree with plaintiffs' first contention. The Current Rule itself, if the provision of emergency contraceptives is "emergency medical care," would create its own "obligation[ ] under the law of providing emergency medical care." The issue thus turns on whether "emergency" contraceptives fall within the term "emergency medical care."

¶ 75    The Conscience Act does not define the term "emergency" in the context of "emergency medical care." Recently, however, the Supreme Court of Illinois defined "emergency" as "an unforeseen circumstance involving imminent danger to a person or property requiring an urgent response." *Gaffney v. Board of Trustees of the Orland Fire Protection District*, 2012 IL 110012, ¶ 64, 969 N.E.2d 359. The court arrived at this "plain and ordinary meaning of the term" when considering its context in section 10(b) of the Public Safety Employee Benefits Act (820 ILCS 320/10 (West 2006)). *Gaffney*, 2012 IL 110012, ¶ 64, 969 N.E.2d 359. Section 10(b) sets forth the eligibility requirements for firefighters, among others, to have their employer pay their health-insurance premiums. One situation in which a firefighter's health-insurance premiums will be paid is when an injury or death occurred when the firefighter responded "to what is reasonably believed to be an emergency." (Emphasis omitted.) (Internal quotation marks omitted.) *Gaffney*, 2012 IL 110012, ¶ 53, 969 N.E.2d 359. In considering the term's meaning, the *Gaffney* court quoted Webster's Third New International Dictionary definition of the term: " 'a sudden bodily alteration such as is likely to require immediate medical attention (as a ruptured appendix or surgical shock).' " *Gaffney*, 2012 IL 110012, ¶ 62, 969 N.E.2d 359 (quoting Webster's Third New International Dictionary 741 (1993)). The *Gaffney* court found the term included "an element of urgency and the need for immediate action." *Gaffney*, 2012 IL 110012, ¶ 62, 969 N.E.2d 359.

¶ 76    We find the plain and ordinary meaning of the term "emergency," as defined by our supreme court in *Gaffney*, is the meaning the General Assembly intended when it included the term in sections 6 and 9. Emergency medical care is medical care with "an element of urgency and the need for immediate action" (*Gaffney*, 2012 IL 110012, ¶ 62, 969 N.E.2d 359), such as " 'a ruptured appendix or surgical shock' " (*Gaffney*, 2012 IL 110012, ¶ 62, 969 N.E.2d 359 (quoting Webster's Third New International Dictionary 741 (1993))).

¶ 77    Applying this definition to the term, we find "emergency contraceptives" do not fall within the plain and ordinary meaning of the term "emergency." The Web site defendants cite for proof "every hour counts" (see http://planbonestep.com (visited Aug. 30, 2012)) indicates if "Plan B One-Step®" is "taken as directed within 72 hours (3 days) ***, it can significantly decrease the chance that you will become pregnant." http://www.planbonestep.com/plan-b-faq.aspx (page visited Aug. 30, 2012). The next line says "[a]bout seven out of every eight women who would have gotten pregnant will not become pregnant," without making any distinction based on whether the emergency contraceptive is taken in the first hour or the seventy-first hour. http://www.planbonestep.com/plan-b-faq.aspx (page visited Aug. 30, 2012). In addition, while Dr. Wallace testified emergency contraceptives become progressively less effective over the course of "several days," he also testified the effectiveness "*may* lead to increased risk that it will be ineffective" if a woman fails to take emergency contraceptives in a timely manner. (Emphasis added.) Given the 72-hour window, even though the window may become narrower in that time frame, unprotected sex does not place a woman in imminent danger requiring an urgent response. See *Gaffney*, 2012 IL 110012, ¶ 64, 969 N.E.2d 359 (providing the definition of "emergency").

¶ 78    Our interpretation and application of the term "emergency" may not be the same definition that would be applied by a woman seeking the emergency contraceptive. However,

the evidence here does not show there would be an imminent danger to the patient or the need for immediate attention as contemplated by the Conscience Act (745 ILCS 70/6, 9 (West 2010)).

¶ 79                                    C. The Injunction

¶ 80        The Conscience Act protects plaintiffs' decisions not to dispense emergency contraceptives due to their conscience beliefs. We need not decide whether the Religious Freedom Act or the first amendment provides similar protections. We return to the question of whether the permanent injunction issued by the circuit court is overly broad. We find it is.

¶ 81        The Conscience Act does not prohibit governmental action that may ultimately force health-care personnel or health-care facilities to make a conscientious decision based on their beliefs not to comply with that governmental action. The Conscience Act, instead, states such personnel or entities may not be discriminated against (745 ILCS 70/5, 7, 10 (West 2010)) or punished civilly or criminally (745 ILCS 70/4, 9 (West 2010)) if they make a conscience-based decision not to comply. The Current Rule does not violate the Conscience Act; its enforcement against plaintiffs on the issue of emergency contraceptives does.

¶ 82        We reverse the permanent injunction granted by the circuit court and order defendants are permanently enjoined from enforcing the Current Rule against plaintiffs in a manner inconsistent with the protections of the Conscience Act.

¶ 83                                    III. CONCLUSION

¶ 84        We affirm the circuit court's findings the Current Rule cannot be enforced against plaintiffs without violating the Conscience Act. We reverse the court's granting of a permanent injunction against defendants' enforcement of the Current Rule. We modify the injunction so it enjoins defendants from enforcing the Current Rule against these plaintiffs, who have conscience-based objections to the Current Rule.

¶ 85        Affirmed in part as modified and reversed in part.